In re SHAFFER–GORDON
ASSOCIATES, INC.,
Debtor.

**Bankruptcy No. 84–01303K.**

United States Bankruptcy Court,
E.D. Pennsylvania.

Dec. 23, 1986.

See also, Bkrtcy., 40 B.R. 956.

time spent upon preparation of fee petitions; and (3) Denying costs for duplicating, long-distance telephone calls, postage, lexis, and travel. The third issue is addressed in our separate Opinion filed this day in *In re National Paragon Corp.* and *In re Donut Shops Management Corp.*, 68 B.R. 337 (Bankr.E.D.Pa.1986), and we shall deny this request consistently with that Opinion. Further, because we adhere to our belief that we can and should exercise our discretion to limit hourly rates to figures below those requested by counsel where we believe that it is appropriate to do so, and we believe that, except in extraordinary situations not present here, time spent upon preparation of fee applications should not be allowed, we shall deny the Motion except to correct an error in failing to deduct the Movant's retainer from the compensation awarded.

The instant Chapter 11 bankruptcy case was filed on April 24, 1984. On May 8, 1984, the Debtor was authorized to employ the Movant and another firm, Meltzer & Schiffrin, as co-counsel. An active Creditors' Committee, which we note has instituted a considerable number of preference actions on behalf of the Debtor in its own name, was authorized to employ the firm of Adelman Lavine Krasny Gold and Levin to represent it.

Michael L. Temin, Barry E. Bressler, Philadelphia, Pa., for debtor.

Myron A. Bloom, Philadelphia, Pa., for Creditors' Committee.

J. Gregg Miller, Philadelphia, Pa., for Aetna Ins. Co.

## OPINION

DAVID A. SCHOLL, Bankruptcy Judge.

We herein consider a Motion of Counsel for the Debtor, Wolf, Block, Schorr, and Solis-Cohen (hereinafter "the Movant"), requesting that we reconsider our Order of September 2, 1986, allowing certain Interim Attorney's Compensation and Costs in an amount less than that requested by the Movant. The issues presented are whether we erred in the following aspects: (1) Granting the hourly rates of certain attorneys in the Movant's firm at a rate of $200.00 per hour in this case, rather than at somewhat higher rates requested; (2) Refusing to change this Court's present policy of declining compensation for allowance for

On December 27, 1985, the Movant filed an Application for Interim Compensation and Costs covering the period from April 17, 1984, through November 30, 1985, in the amounts of $67,864.00 for interim compensation for service and $1,630.31 for "reimbursement of out-of-pocket expenses and costs," $35,000.00 of which had been paid in a retainer from the Debtor. The Order accompanying the Application was in two (2) pages, the second of which had only one (1) line at the very top which indicated that the amount which it was authorized that the Movant be paid was to be "less $35,000.00 already paid as a retainer." The Application requested fees at "average hourly rates" of members of the Movant's

firm ranging from $40.00 for a non-lawyer "summer associate" to $232.13 for Lowell H. Dubrow, Esquire. In all, seven (7) of the Movant's attorneys worked on the case and requested compensation at hourly rates of $123.72, $125.00, $185.00, $195.00, $215.00, and $230.37, in addition to Mr. Dubrow, and $40.00 and $70.00 hourly for two (2) paralegals.

We note that co-counsel, Meltzer & Schiffrin, was awarded interim fees of $29,-962.50 for compensation and costs on February 5, 1985; $5,833.69 on March 4, 1985; and $76,882.00 on September 2, 1986. Counsel for the Creditors' Committee was awarded total compensation of $33,131.51 on July 17, 1985; and $29,812.00 on November 17, 1986. Other amounts have been requested for accountants and other professionals involved in this matter.

The Application of the Movant was pending for several months before this Court when we were sworn in on August 27, 1986. On September 2, 1986, we entered an Order allowing the Movant compensation of $19,072.50 and costs of $209.25. We believed that the form of Order submitted to us requested us to set the net figure which the Movant was to be allowed for compensation after deduction of the $35,000.00 retainer. When the large discrepancy between the amount requested ($67,864.00) and that allowed ($19,072.50) was called to our attention, we noted our error and indicated a willingness to amend the Order to allow a total compensatory sum of $54,072.50 to the Movant. However, we also explained that we had deducted all time allocated upon the preparation of the fee application, had eliminated several hours allocated for intra-firm conferences, had reduced the hourly rate of all attorneys requesting in excess of that rate to $200.00 hourly, and had eliminated all of the requests for costs except for the $200.00 filing fee and a few small charges for notarizations. Given this explanation, the Movant decided to file and did timely file the instant timely Motion for Reconsideration on September 12, 1986.

The Motion came before the Court for argument on October 14, 1986, and argument was presented on behalf of the Movant by Michael L. Temin, Esquire. Mr. Temin had personally requested compensation in this case for 198½ hours at $230.37 per hour, or a total of $45,739.00. Subsequent to the argument, consistent with Mr. Temin's expression of a desire to submit a Brief, the Court accorded him an opportunity to do so on or before October 22, 1986, specifically requesting that he address the following issues, in an Order of October 16, 1986:

1. May the Court exercise its discretion to limit hourly rates of attorney-applicants to $200.00 per hour? It would also be helpful to the Court to be advised how the "average hourly rates" set forth in the Application, particularly those in excess of $200.00 per hour, were ascertained.

2. Should the Court reconsider its present policy of refusing to allow for time spent on preparation of fee applications?

3. May the Court exercise its discretion to deny costs for duplicating, long distance telephone calls, postage, lexis, and/or "travel?"

At the argument on October 14, 1986, Mr. Temin offered into evidence his most impressive personal resumé, a handsome brochure describing the Movant and its prominence in our City, and the most recent Operating Statement of the Debtor, indicating accounts receivable of just under $3,000,000.00 and cash on hand of just over $1,000,000.00. However, in the Brief, despite the specific request for same, the only explanation of the ascertainment of the hourly rates was the following passage:

The "average hourly rates" specified in the Application were the result of an arithmetic calculation bsed [sic] on each attorney's regular hourly rate in effect on the date each particular service was rendered. Brief, at 2 n. 2.

In light of the Briefs and argument presented, we have carefully reconsidered and amended somewhat the positions which

we indicated to the Movant at the oral argument on October 14, 1986, had led us to the conclusions that we reached in rendering our Order of September 2, 1986. However, we have not changed our original view that our Order of September 2, 1986, in response to the Movant's Application was proper, except to correct the Order to indicate that the total compensation meant to be awarded was $54,072.50.

The principal argument of the Movant, with respect to the hour-rate limit established, was that, in so doing, the Court failed to adhere to the "market standards rule" adopted by the Court of Appeals in *In re Fine Paper Antitrust Litigation*, 751 F.2d 562, 590 (3d Cir.1984), in response to the Supreme Court's pronouncements in *Hensley v. Eckerhart*, 461 U.S. 424, 103 S.Ct. 1933, 76 L.Ed.2d 40 (1983). Addressing the issue of allowance for time spent in preparation of the fee applications, the Movant cited to a passage in *Fine Paper*, *id.* at 595 n. 26, where the court stated that "[i]n litigated statutory fee cases," fee petition time is reimburseable, and to *In re Nucorp Energy, Inc.*, 764 F.2d 655 (9th Cir.1985); *In re Rose Pass Mines, Inc.*, 615 F.2d 1088 (5th Cir.1980); *Prandini v. National Tea Co.*, 585 F.2d 47 (3d Cir.1978); and *In re Bible Deliverance Evangelistic Church*, 39 B.R. 768 (Bankr.E.D.Pa.1984) (per KING, J.).

■ On the issue of allowing of reimbursement for costs, the Movant cited principally to *Boston & Maine Corp. v. Moore*, 776 F.2d 2, 11 (1st Cir.1985). On November 14, 1986, Meltzer & Schiffrin submitted a Brief supporting the Movant's Brief as to the reimbursement-of-costs issue only. The other issues were not addressed by Meltzer & Schiffrin at all, and we observe that none of their attorneys have requested compensation at rates exceeding $200.00 per hour, nor did they seek compensation for time spent on their fee requests in their Applications. We disagree totally with the suggestion of Meltzer and Schiffrin that it is a violation of the Code of Professional Responsibility and Rules of Disciplinary Enforcement (hereinafter "Disciplinary Rules") to suggest that such costs to be absorbed by firms representing Debtors in bankruptcy court. The Disciplinary Rules section quoted, Disciplinary Rule 5–103(B), specifically *allows* a lawyer to advance "court costs, expenses of litigation, expenses of medical examination, and costs of obtaining and presenting evidence, provided the client remains ultimately liable for such expenses." All of the items specifically referred to are items for which we *would* allow reimbursement. We see nothing here, or elsewhere in any source, which requires law firms to bill clients for copying, postage, or telephone calls. As we indicate in the *National Paragon* Opinion, we resist the suggestion that because this is how certain firms *do* their billing, the Court must accept this in ruling on fee applications. As we indicate *infra*, we believe that we have a mandate to actively determine what costs (and what hourly rates) are appropriate, rather than merely being forced to fall in line with whatever practices certain firms choose to effect in their billing practices.

■ However, we do agree with the point made by Meltzer and Schiffrin that costs for copying and postage might be allowable if these were identified and itemized as efforts to alleviate the strains on our Clerk's Office by making mailings which that Office would normally undertake. To our minds, such costs would be "extraordinary" and hence allowable.

Our starting point for consideration of the two (2) remaining questions after the *National Paragon* decision and the foregoing cómments on the costs issue is the observation of the Court of Appeals that we "must cast a critical eye" on fee requests, *Ursic v. Bethlehem Mines*, 719 F.2d 670, 676 (3d Cir.1983), if we are to face up to the judicial and public concern "that a portion of the legal profession seems to be more interested in the subject of fees than in performing quality legal services." *Cunningham v. City of McKeesport*, 753 F.2d 262, 270 (3d Cir.1985) (Statement per ADAMS, J., sur Denial of Petition for Rehearing). Indeed, abuses in

the fee process were one of the principal subjects addressed by a Third Circuit Task Force on the subject of attorney's fees. *Court Awarded Attorney Fees,* 108 F.R.D. 237 (1985). *See id.* at 246–49.

The Task Force Report, as do many of the fee-application decisions of the Court of Appeals, addresses and encourages the distinction between "fund-in-court" and "statutory fee" cases in making fee petition determinations. This distinction is said to be particularly critical to the analysis of why time for preparation of fee petitions is not allowed in "fund-in-court cases" and is allowed in "statutory fee" cases. *Id.* at 250–51. In the former,

> the fees are not assessed against the unsuccessful litigant (fee shifting) but rather are taken from the fund or damage recovery (fee spreading), thereby avoiding the unjust enrichment of those who would otherwise be benefited by the fund without sharing in the expenses incurred by the successful litigant. *Id.* at 250.

Meanwhile, in statutory-fee cases, there is a

> legislative history [which] makes it clear that the intent of Congress was to encourage private enforcement of the statutory substantive rights, whether they be economic or noneconomic, through the judicial process. 108 F.R.D. at 250.

A further principal distinction between the two (2) is that there is generally an intense adversarial relationship present in statutory-fee matters, because the losing party will be compelled to pay the fees out of its own pocket. In a "fund-in-court" matter, the adversarial process is often diminished or absent, and hence the need for "judicial scrutiny" is heightened. *Id.* at 251.

The importance of the distinction in this classification is emphasized by the Court of Appeals again and again, in, *e.g., Fine Paper,* 751 F.2d at 595; *Pawlak v. Greena-walt,* 713 F.2d 972, 981 (3d Cir.1983); *Prandini, supra,* 585 F.2d at 52–53; and *Lindy Bros. Bldrs., Inc. v. American Radiator & Standard Sanitary,* 540 F.2d 102, 111 (3d Cir.1976), and acknowledged by the Movant in its Brief. In *Fine Paper,* the most recent of these, the Court refuses to reconsider the *Lindy Bros.* holding that "in fund-in-court cases time spent in preparation of fee petitions does not benefit the class and cannot be included in the lodestar." 751 F.2d at 595.

The Ninth Circuit Court of Appeals, in the *Nucorp* case, accepted the distinctions articulated in the above Third Circuit cases. The Court there further recognized that "[t]he source of attorneys' fees in bankruptcy cases is not parallel to the source of fees in the other statutory cases." 764 F.2d at 662. Indeed, it is not. The Fees paid to counsel in a bankruptcy case come not from the pocket of a wrongdoing party to which the fee-shifting statute is directed as a disincentive to the conduct of the wrongdoer that led to the litigation, but instead "the fee is paid out of the bankrupt estate." *Id.* The *Nucorp* Court, however, finds that, "[i]n bankruptcy proceedings the fee is [not] paid directly from a fund created for the benefit of the client," but is "unique." *Id.* Ultimately, the Court resolves the issue that the bankruptcy-case situation fits in neither category by deciding that the policies of the Bankruptcy Code "closely parallel the other statutory fee cases." *Id.* Thus, the *Nucorp* Court allows compensation for time spent on fee petitions.[1]

We have found no case in this Circuit addressing the issue of the propriety of awarding compensation for preparation of fee applications in bankruptcy cases under the Code. This, in itself, would appear to be testimony to the appropriateness of the policy of at least some judges in this district of refusing to allow such compensation in all but extraordinary situations.

---

1. The Fifth Circuit decision, *Rose Pass Mines,* is less satisfying. Although stating that "we do not see how such a task [as preparing a fee petition] could consume more than ten or twelve work hours or merit compensation at the rate of $100.00 per hour," as allowed by the bankruptcy court, the Court, without any analysis of the "fund-in-court" and "statutory-fee" distinction, held that *some* compensation was appropriate. 615 F.2d at 1093.

*Compare In re Horn & Hardart,* 30 B.R. 938, 943–44 (Bankr. E.D.Pa.1983); *In re Hotel Associates,* 28 B.R. 332, 334 (Bankr. E.D.Pa.1983); *In re Absco, Inc.,* 23 B.R. 250, 252 (Bankr. E.D.Pa.1982), *with In re Bible Deliverance, supra,* 39 B.R. at 772–75. All of the foregoing were decisions by Judge King of this Court, our direct predecessor. We totally agree with the statements of Judge King in *Bible Deliverance* that allowances can be made where the combination of Debtor solvency, requiring fees to be paid out of the Debtor's pocket rather than the estate, is found in combination with lack of cooperation by the Debtor, making such compensation appropriate. *See id.* at 773, 776. However, we also agree that, in general, Counsel is protecting its "personal interests" in preparing a fee application rather than providing a "benefit to the estate." *See Hotel Associates,* 28 B.R. at 334.

Moreover, the policy in this district appears directly supported by several pre-Code decisions of the Court of Appeals. *In re Meade Land and Development Co., Inc.,* 527 F.2d 280 (3d Cir.1975); *In re Imperial "400" Nat'l, Inc.,* 432 F.2d 232 (3d Cir.1970); and *United States v. Larchwood Gardens, Inc.,* 420 F.2d 531 (3d Cir. 1970). In *Meade Land,* a much-quoted authority for its statements regarding the specificity required in bankruptcy fee petitions under the Code as well as the Act, the Court states that

> some of the time for which compensation is sought was devoted to the preparation of counsel's requests for fees. While such services are legal services, there is a substantial question as to whether they are compensable. 527 F.2d at 285 n. 5.

In *Imperial "400",* while admittedly the Court was ruling under the "strict economy" principles of the Bankruptcy Act, which this Court recognizes have been tempered by the Code,[2] the Court held that

time "spent in applying for or in defending interim fee awards" was not "legally compensable." 432 F.2d at 239. In *Larchwood Gardens,* in considering an application for compensation by a governmentally-appointed receiver, the Court held that time spent by the receiver in defending his requests for an attorney's fee and court costs were not compensable. 420 F.2d at 534.

■ Similar considerations to those recited by this Court in *Hotel Associates* were also recited by our local Court of Appeals in a somewhat different context in *Shadis v. Beal,* 703 F.2d 71 (3d Cir.1983). There, the Court of Appeals refused to extend the liability of a party defendant in a statutory fee case to a situation where counsel for a party whom it successfully represented in a Civil Rights fee application sought to recover for time spent on its own fee applications. The holding that this request was "too attenuated to result in any punitive or deterrent effect on potential violators, or to encourage lawyers to represent indigent clients," *id.* at 73, is appropriate here. The Movant's efforts to secure its own compensation, in line with the requirements set forth in *Meade Land,* are too closely tied to its own interests and are too attenuated from benefit to the estate to merit compensation.

Logically, we also cannot detect any substantial distinction between the fund created in our court in a bankruptcy case and other fund-in-court cases. Most bankruptcies are brought about by a fiscal crisis experienced by a debtor. In a typical Chapter 11 case, the debtor is insolvent and a plan which impairs the rights of one or more classes of creditors is prepared. Any amounts paid to counsel will usually result in a reduction in a distribution to creditors. The interests of innocent creditors may be sacrificed if funds are distributed to counsel for a fee. Many of these creditors express indignation when they learn that

---

2. We recognize the accuracy of the Movant's observation that the Act's policy of strict economy is eliminated by the Code. 2 COLLIER ON BANKRUPTCY ¶ 330.05[e], at 330–33 to 330–35. Nevertheless, all considerations of economy should not be forsaken. *See, e.g., In re Shades*

*of Beauty, Inc.,* 56 B.R. 946, 951 (Bankr.E.D.N.Y. 1986); *In re Four Star Terminals, Inc.,* 42 B.R. 419, 429 (Bankr.D.Ala.1984); and *In re Nation/Ruskin,* 22 B.R. 207, 209 (Bankr.E.D.Pa. 1982) (per KING, J.).

their claims are subordinate in time, amount, or both to attorneys, who entered into their contract of representation with their eyes open as to a debtor's fiscal problems. Meanwhile, in a statutory-fee case, a "guilty" wrongdoer must pay the counsel fees, and no innocent party can possibly be prejudiced by the award of fees to counsel. It therefore seems to us that a bankruptcy case is very much like a fund-in-court case, and bears little or no resemblance to a statutory-fee case.

Logic, as well as precedent in this Circuit, therefore appears to support our continuation of the Court's policy of not allowing time for compensation on fee petitions. We do note that the reasoning and result in *Nucorp* has been rejected by other courts as well. *See, e.g., In re Mansfield Tire & Rubber Co.,* 65 B.R. 446, 458 (Bankr.N.D. Ohio 1986).

██ The remaining issue is whether this Court abused its discretion, or proceeded in a manner inconsistent with *Fine Paper,* in refusing to award compensation to any of the Movant's attorneys at an hourly rate in excess of $200.00 hourly for services performed on this case. We conclude that we have not abused our discretion in this case, although we do modify any previous statements suggesting that we would never award more than $200.00 per hour in *any* case. We believe that inflation, and possibly the combination of a case requiring extraordinary skill and the demonstration of such skill by extremely competent counsel could justify a higher rate, and it would be an error to put a cap on the hourly rate for any and all work, sight unseen. We also consider it equally necessary to review hourly rates sought by counsel less skilled than those employed by the Movant, or other less prominent members of the Movant's firm, who seek lower rates. However, we do not believe that we abused our discretion in refusing to award to counsel fees at a rate of no greater than $200.00 per hour in this case, since we know first-hand that this figure constitutes a relatively very high rate in our local bankruptcy-court marketplace for work in

a case which does not present extraordinary difficulties.

In *Fine Paper,* the Court of Appeals held that the district court abused its discretion in evaluating fee applications when it established a rate of $150.00 hourly for Harold Kohn and Granvil I. Specks, attorneys of highest national prominence; $100.00 hourly for all "partner level work;" and $50.00 hourly for all "associate level work" in that case, based upon "a hypothetical national billing rate" and without regard "to the relative levels of experience, skill, or prestige in the marketplace, of the attorneys in question." 751 F.2d at 590. The Court of Appeals therein noted that higher rates (but none higher than $160.00 per hour are cited) have been awarded in reported decisions. *Id.* at 590 n. 22.

In the instant case, we have had the experience of reviewing numerous applications seeking various hourly rates in our local bankruptcy-court marketplace before we entered any orders on any fee petitions, and we have ruled on numerous applications since. As a result of that experience, we limited the rate to counsel here to $200.00 per hour, a figure considerably in excess of that allowed to *any* of the counsel in *Fine Paper* or the cases which it cites. We believe that the average rate requested by very competent counsel at our local bar is $150.00 per hour, and do not consider this rate to be such as would drive any local counsel out of bankruptcy practice. While we do not suggest that the Movant is over-stating its attorney's hourly rates, we must confess that we can perceive no reason why counsel, in any fee petition, would not ask for as much as was reasonably justifiable. The average rate requested, we therefore suspect, is the highest possible indication of the local market rates. As we state below, it is incumbent upon the Court to place some checks upon counsel's requests in this regard, because the local market rates could otherwise simply be manipulated upwards by the bar, particularly due to the non-adversarial context in which most fee petitions are decided.

Further, this case, while undoubtedly qualifying as a "big Chapter 11 case," has not, to our perception, presented any issues of such a unique and unusual nature that only an extremely qualified attorney, charging the absolute highest rates among the members of our local bar, could handle it. Other competent counsel are involved in the case as co-counsel and in representing a Creditors' Committee which has obviously worked with rather than against the Debtor. While we do not equate the work of Counsel here with the legal equivalent of "painting a farmer's barn," neither do we consider the services here the legal equivalent of the Sistine Chapel. *See, Ursic,* 719 F.2d at 677. Therefore, we believe that it would run counter to the directives of the Court of Appeals to award what we know, from our experience, is a "Michelangelo" hourly rate. *See id.*

■ We must firmly state that we believe that it is absolutely necessary that we take an active role in evaluating the work performed and the total requests and hourly rates requested in fee petitions which come before us. *Compare Harman v. Levin,* 772 F.2d 1150, 1152 n. 2 (4th Cir. 1985) (award of $600.00 to counsel in Chapter 13 cases, representing an average reduction of forty (40%) percent of sums requested, upheld); and *In re Lock Shoppe, Inc.,* 67 B.R. 74 (Bankr.E.D.Pa.1986) (per FOX, B.J.) (Trustee's Counsel limited to $485.00 fee for services in case of estate consisting of $900.00). Despite our great respect for Mr. Temin and his firm, we respectfully reject the analysis presented by the Movant: that we must "begin" our analysis with an attorney's "regular hourly rate," the computation of which we do not totally comprehend and has been only vaguely explained despite our specific requests, and must presumably end with the figure served up to us unless we can establish, on a detailed analysis, that this rate is wrong or that the quality of the work was in some way deficient.

Rather, we believe that it is for the Court to determine what a reasonable hourly rate for a certain task is, and then require the

bar to conform to it. This is not contrary to the teaching of *Fine Paper,* which merely rejects the concept that the court can simply pull figures out of the air, such as it appeared that the district court did in *Fine Paper* when it applied a "hypothetical national billing rate" derived from no particular specific source. Our source, as we mentioned, is our constant exposure to the rates requested by other members of the local bankruptcy bar. Also, we believe that this approach is totally consistent with that proposed by the Third Circuit Task Force, which specifically suggested that the courts develop a standardization of hourly rates established by a Fee Advisory Committee. 108 F.R.D. at 260–62. We do note that a standardized rate schedule established by Community Legal Services, Inc., for use in the Philadelphia community posited hourly rates of $130.00 to $200.00 hourly for the highest classification of attorneys. *Id.* at 260 n. 70. Also, we note that our own survey is entirely from requests by attorneys and is not tempered, as we suspect that it would be, by consideration of the views of creditors.

In the absence of such a Fee Advisory Committee, which would in our view be an appropriate vehicle for establishing rates in our cases only if it had creditor-representation, this Court is inclined to give Counsel, such as Mr. Temin, who is devoted to serving the Court as well as his clients, the benefit of any doubt. However, we believe that we *are* giving his firm the full benefit of any doubt in awarding him and his colleagues rates of up to $200.00 per hour in this case. We further reiterate that, in other, extraordinary case-situations, we could conceivably award a higher hourly rate.

We shall therefore enter an Order correcting our mistake in failing to indicate that we meant to award the Movant a total sum of $54,072.50 in compensatory fees; but, in all other aspects, we shall deny the Motion.