**In re FACTORY TIRE DISTRIBUTORS, INC., Debtor.**

**Bankruptcy No. 83–53.**

United States Bankruptcy Court, W.D. Pennsylvania.

March 31, 1987.

---

Douglas A. Campbell, Pittsburgh, Pa., Trustee.

David B. Salzman, Campbell & Levine, Pittsburgh, Pa., for Trustee.

Donald L. Phillips, Phillips & Gallanter, Pittsburgh, Pa., Special Counsel for Trustee.

## MEMORANDUM OPINION

BERNARD MARKOVITZ, Bankruptcy Judge.

Before the Court are the fee requests of Counsel to the Trustee, Special Counsel to the Trustee, and Accountant to the Trustee in this Chapter 7 liquidation case. All of the above-mentioned parties have received interim compensation and presently seek a final distribution, so that the case may be closed.

Due in large part to our displeasure with the manner in which some of these interim fees have been distributed, and the content of said requests, we believe it is necessary to fully address and analyze these matters.

The following castigation applies not only to those parties presently before the Court, but also to the body of practitioners who regularly appear in our forum, and practice their craft in a similarly notorious fashion.

### A. The Fee History Of The Case

Factory Tire Distributors, Inc. filed its Chapter 11 petition on January 11, 1983. The case was converted to a Chapter 7 liquidation on June 14, 1983, at which time the Trustee was appointed. For services rendered during the course of the five (5) month attempt at reorganization, Debtor's

counsel was paid $16,817.00, and Debtor's co-counsel was paid $13,932.00. Also for that five (5) month period, counsel for the petitioning creditors received $7,075.00 and the Creditors' Committee's accountant was paid $8,487.32. In all, professionals were paid $46,311.82, for services rendered during a five (5) month failed attempt at reorganization. This Court views as suspect, any statement indicating any possibility of reorganization, even from the date of filing.

Since June 14, 1983, the time of conversion, the Trustee has sold the estate property, caused two (2) partial distributions to creditors, objected to claims against the estate by various insiders, and brought complaints against various insiders for fraudulent transfers and money judgments, as well as seeking a denial of the principal's individual discharge. In so proceeding, the Trustee received Court approval for the employment of his law firm as Counsel to the Trustee; he also received authority to employ the petitioning creditors' counsel as Special Counsel to the Trustee, and the Creditors' Committee's accountant as Accountant to the Trustee. These latter two appointments were presumably made because their familiarity with the estate and its creditors would generate a cost savings to the estate. Since this conversion, Trustee's counsel has received $45,225.90; special counsel has received $7,770.10; and Trustee's accountant has received $38,124.75—for a total professional fee expense of $91,120.75 since conversion, and $137,432.57 since the initial filing.

These professionals now request the following additional compensation:

| | |
|---|---|
| Attorney for Trustee | $ 9,405.16 |
| Special Counsel for Trustee | 4,562.50 |
| Accountant for Trustee | 14,779.80 |

If these fees were permitted as requested, the estate would be charged a total of $166,180.03 to reach the following results:

1) filing of a Chapter 11 reorganization petition which was converted five (5) months later;

2) liquidation of the estate, with a distribution of twenty-three percent (23%) to the unsecured creditors; and

3) receipt of large judgments against presently judgment-proof defendants, who show no indication of changing said status.

**B. Fee Application Of Special Counsel**

■ Petitioner requests $4,562.50 for services rendered from June 6, 1984 through June 16, 1986. The services were provided in conjunction with Trustee's prosecution of fraudulent and preferential transfers made to various insiders. Said counsel's services were of a benefit to the estate, in that his prior familiarity with the case provided the estate with economical assistance, and his efforts resulted in sizable, albeit presently uncollectable, judgments against several of the insiders. The services of this counsel were generally of high quality. However, certain of Petitioner's entries on his time records are too general to be compensable, *inter alia:* status conference, review file, and telephone call with _____. Counsel is advised that these offers are compensable only when the substantive nature of the activity is also expressed. Having so said, Petitioner is awarded $3,512.50 as his final fees in this case.

**C. Accountant For The Trustee**

Petitioner seeks fees and expenses totaling $14,779.80 for the period of October 22, 1985 through June 13, 1986. As has become the rule rather than the exception with this particular Petitioner, we find many egregious difficulties.

We begin by stating that at the hearing on this matter, the Court was advised that the following hourly rates were charged:

| | |
|---|---|
| JEM | $125.00 |
| LJR | 80.00 |
| RAF | 65.00 |
| RCO | 65.00 |

■ Admittedly in part because we have had occasion to question this Petitioner's fees in the past, we calculated the hours listed on Petitioner's time records, using

the above-listed hourly rates. To our dismay (if not our surprise) the total was $9,846.00—Petitioner's fee requested is $14,490.00. This Court is hard pressed to accept an error of $4,644.00 when Petitioner is a Certified Public Accountant—we have additional cause to question when this rather odd discrepancy occurred in Petitioner's own fee request. Having so said, it appears to this Court that a fee of $125.00 per hour for JEM's services is far too generous; his hourly rate will be reduced to $100.00—and we believe this might still be more than is appropriate.

■ We turn our attention next to Petitioner's activities as they relate to FBI investigations of the Debtor. Initially we note that only 3.1 hours were so spent pursuant to the present fee petition. However, this accountant claims to have spent a total of 60.8 hours on this FBI investigation, including over 14 hours of meetings with a specific agent; the balance of the time was spent on finding and checking various records pertinent to said investigation. Of this 60.8 hours, Petitioner was compensated for 10.6, prior to this Court's administration of the case. While we believe that all professionals should willingly cooperate with governmental investigative bodies, we cannot condone the funding of such efforts by the unsecured creditors, without prior Court approval. This Court will not disturb the payment previously made; however, no further compensation for said activities will be granted.

■ As if these problems were not enough, Petitioner seeks this Court's approval of time spent on activities so ambiguously explained and/or so blatantly duplicated as to strain the Court's credulity to the breaking point. As stated previously, this is not the first time that this particular Petitioner has been admonished by this Court for flagrant generalities and duplications. As examples of the same, we offer the following:

1) from January 7–10, 1986, RAF spent 13.0 hours ascertaining the validity of various tax claims and drafting a letter to the Trustee thereon; from January 13–15, 1986, LJR spent 13.0 hours "following up" on this same material;

2) from January 17–21 and 23–24, 1986, LJR spent 6.4 hours preparing tax returns for which no specific year is indicated (as other entries do in fact, state years, it appears that LJR knows how to provide this information);

3) on January 22, 1986, LJR spent 1.9 hours preparing 1983 returns (presumably some of the above-mentioned hours were also so spent); from June 9–11, 1986, *five (5) months later*, RAF spent 20.1 hours preparing the same returns;

4) on January 28–29, and February 12, 1986, LJR spent 4.7 hours preparing 1984 returns (again we presume some of the undated time in No. 2 above belongs here); on June 11–12, 1986, again *five (5) months later*, RAF spent 10.5 hours on the same returns;

5) on March 26, 1986, JEM and LJR both list 2 hours spent meeting with the Trustee; such "double-teaming" is not compensable. (We know this to be double-teaming since the Trustee's counsel shows only 2 hours so spent.);

6) on June 13, 1986, JEM, LJR, and RAF spent a total of 16.5 hours preparing and reviewing the 1985 tax returns. It appears that RAF did only mechanical preparation; LJR conducted a theory review and JEM provided a final review. It is unconscionable to charge this estate $1,432.50 for three (3) Certified Public Accountants to prepare tax returns for a company which has been *non-operational* since June of 1983.

As unbelievable as the above-mentioned items are, they are not the entirety, but serve only as an example of the outrageousness of Petitioner's activities. "Falsus in uno, falsus in omnibus."

It is even more troubling to note the hours spent by the accountants in this case, when this Court remembers the difficulty LJR had in remembering much of his work product when called upon to testify at the adversary trials. This accounting firm

claims to have spent a total of 814.7 hours on this case, including that time spent as accountant for the Creditors' Committee. Given that figure, we find it hard to believe that these accountants were not intimately familiar with the case.

Finally, we turn to a discussion of Petitioner's requested expenses. While the amount, $289.80, may be minimal, the outrageous nature of these entries cannot go unchecked. Petitioner lists telephone charges of $81.88 for the months of October 1985 through June 1986. First and foremost causing consternation is the lack of indication anywhere on the time sheets that any calls, other than local calls, were made. Local telephone charges are considered overhead expenses, and are not compensable. Additionally, we question telephone charges for November, 1985; Petitioner's fee application indicates absolutely no work done during that month. Furthermore, Petitioner seeks mileage reimbursements of $148.25 for December 1985 through June 1986. Again we refer to the time records presented and find the only travel indicated to be meetings with the Trustee. Given that Petitioner's office is approximately 7 blocks from the Trustee's office, we are hard pressed to understand why the estate is being charged in this manner. As to the other items listed, i.e. express mail, supplies, and miscellaneous—these items are noncompensable. While the activities giving rise to Petitioner's request for postage are not clearly enunciated, the time records do indicate various correspondence and we will therefore allow this expense.

Given the plethora of unjustifiable error and incredible ambiguity and duplication, Petitioner's request of $14,779.80 is reduced to $4,580.74.

### D. Counsel to the Trustee

█ If our reaction to the accountant's application can be classified as outrage, then our response to this Petitioner must be considered disappointment. We recognize that counsel prepared a very helpful narrative statement to support his time records, and that said records are probably the most clear and concise we have recently observed. Be that as it may, we are sincerely disturbed that counsel has done a major disservice to his clients, the Trustee and the unsecured creditors, in allowing the above-mentioned fee applications to go forward, without ever voicing the slightest objection. Clearly, many objectionable activities have occurred and, for some of these, compensation has already been paid. Given counsel's knowledge, however, of the light in which this Court examines fee applications, it was, and is incumbent upon him to scrutinize these fees and object where appropriate. This Court has had precious little time to review these fees and expenses—even so, we have been able to glean over a half dozen egregious errors in the accountant's final application. The fact that the Trustee urged this Court to hire said accountant does not make objection to his fees inappropriate. In fact, we are reasonably certain that this particular Trustee would be raising loud and raucous objections if these same fee applications were filed by an adversarial party.

█ The accountant is answerable to the Trustee—but the Trustee, as a fiduciary, is answerable to the unsecured creditors. If the Trustee filed no objections because he is unable to recognize these consistent and profound irregularities, then perhaps he should not serve in such a capacity. Having so said, we believe that the hourly rate requested by counsel is, at least in this case, not acceptable. Because the quality of the services rendered herein bespeaks the efforts of an inexperienced, rather than accomplished practitioner, counsel's fees will be reduced to $75.00 per hour for all attorney time. The Court acknowledges that it can be argued, with great weight, that this reduced rate is too generous.

█ In addition, certain of the time spent by DAC and DBS was duplicative; for those services, compensation will be granted for only one attorney's time. Further, DAC shows 3 hours of attorney time spend on June 11, 1986, the date of the preferential and fraudulent transfer trials. On that date DBS represented the Trustee—DAC is the Trustee, and was present

in order to offer substantial testimony. Said testimony is not compensable as counsel time.

 Finally, this Court appreciates the efficiency and economy resulting from the utilization of paralegals, and believes that their services should be compensable. However, we do not consider hourly rates which include a profit margin to be acceptable. We therefore compensate paralegals at $20 per hour—not $40 per hour. This rate, over a 160–hour month, approximates $40,000.00 annually. Surely this sum will reimburse the expense of the paralegal.

Counsel to the Trustee will receive $6,079.66 in fees and expense reimbursement.

### E. Summary

It should be readily apparent that we are disturbed by the performance of some of the parties in this case. However this displeasure is not relegated to these individuals alone; we speak here to offer guidance to other practitioners, similarly situated, that this level of professionalism will no longer be tolerated.

As we have already reconsidered this Opinion, prior to its execution, it will not be necessary for any aggrieved party to file motions asking this Court to do so again.

An appropriate Order will be issued.

### ORDER OF COURT

AND NOW, at Pittsburgh in said District this 31st day of March, 1987, the Third Interim Distribution is APPROVED, with the modifications necessary to comport with the foregoing Memorandum Opinion of this same date.