**In re J.E. JENNINGS, INC., d/b/a Kids Point of View, Debtor.**

**Bankruptcy No. 83–03251S.**

United States Bankruptcy Court,
E.D. Pennsylvania.

June 20, 1989.

Kenneth F. Carobus, Philadelphia, Pa., for applicants.

James J. O'Connell, Asst. U.S. Trustee, Philadelphia, Pa., U.S. Trustee.

Erwin L. Pincus, Philadelphia, Pa., for debtor.

## OPINION

DAVID A. SCHOLL, Bankruptcy Judge.

On February 13, 1989, the district court, per the Honorable Joseph L. McGlynn, Jr., in a Memorandum of Decision reported at 96 B.R. 500, vacated and remanded our Opinion and Order of November 10, 1986, reported at 67 B.R. 106. In that Opinion, we had denied Applications for Compensation filed on behalf of Albert Vogel, appointed as Secretary (hereinafter referred to as "the Secretary") of the Official Unsecured Creditors' Committee (hereinafter "the Committee") by this court on September 13, 1983; and for expenses incurred by four members of the Committee: Blue Bell, Inc. (hereinafter "Blue"); Health Tex, Inc. (hereinafter "Health"); Calabash Fashions, Ltd. (hereinafter "Calabash"); and Tulip Tops, a division of American Argo Corp. (hereinafter "Tulip") (Hereinafter these parties are collectively referred to as "the Members" and the Secretary and the Mem-

bers are referred to collectively as "the Applicants").

In our earlier Opinion, we had reasoned that the exclusion of official committees from the scope of 11 U.S.C. § 503(b)(3)(D) precluded any allowances on either of the Applications. The district court, meanwhile, held that, while § 503(b)(3)(D) was not a basis for allowance of such compensation, reimbursement should have been allowed to the applicants under § 503(b)(1)(A),[1] which states as follows:

> (b) After notice and a hearing, there shall be allowed administrative expenses, other than claims allowed under section 502(f) of this title, including—
>
> (1)(A) the actual, necessary costs and expenses of preserving the estate, including wages, salaries, or commissions for services rendered after the commencement of the case; ...

Having ascertained that the record in this case which was to have been remanded to us was lost by the district court clerk's office sometime after February 13, 1989, we entered an Order of April 10, 1989, directing counsel for the Applicants to recreate the record and scheduling a conference to determine how this court should proceed on remand on April 26, 1989. Only counsel for the Applicants appeared and argued that Judge McGlynn's Opinion required us to grant their compensation and costs in full as requested. We disagreed, observing that, if this were so, Judge McGlynn would have remanded the matter to us with a direction to enter such an order, rather than, as he did, remanding it generally. We therefore entered an Order of April 27, 1989, requiring the Secretary and the Members to file Supplemental Applications in accordance with *In re Meade Land & Development Co., Inc.,* 527 F.2d

---

1. In so holding, Judge McGlynn also implicitly rejected the reasoning of the only prior decision in this area in this court, *In re Windsor Communications Group, Inc.,* 54 B.R. 504 (Bankr.E.D. Pa.1985), in which our predecessor, the Honorable William A. King, Jr., held that such compensation was allowable only if Committee members had made a "substantial contribution" to the case, as required by § 503(b)(3)(D). *Windsor Communications* therefore concluded, contrary to our earlier Opinion, that official com-

mittees were to be treated the same as "other" committees. Judge McGlynn, while agreeing with our Opinion that official committees were excluded from § 503(b)(3)(D), held that compensation was allowable to such committees and the Secretary on another basis, *i.e.,* § 503(b)(1)(A). Cases following the various reasoning of Judge McGlynn, Judge King, and our original Opinion are collected in the Opinions of Judge McGlynn and this court.

280 (3d Cir.1975); *In re Metro Transportation Co.,* 78 B.R. 416, 410 (Bankr.E.D.Pa. 1987); and *In re Mayflower Associates,* 78 B.R. 41, 48 (Bankr.E.D.Pa.1987), on or before May 26, 1989; and advising counsel for the Debtor and the United States Trustee that they had until June 15, 1989, to file and serve any Objections to the aforesaid Amended Applications. We further stated that, if no Objections were filed, we would enter an Order in reference to the Amended Applications without a further hearing.

The Amended Applications were timely filed on May 22, 1989. However, their conformity with the foregoing court decisions, as will be discussed below, is doubtful. They were accompanied by a short Memorandum of Law in which the Applicants reiterated their view that it was inappropriate for this court to review these Applications and that it would be contrary to the Opinion of Judge McGlynn to do other than approve them in full as submitted. The United States Trustee filed Objections to both Amended Applications, pointing out that the lack of receipts for expenses rendered these submissions out of compliance with *Mayflower.* Those Objections implicitly decline to accept the Applicants' contention that it is beyond the province of this court to review these Applications to determine if they complied with the Opinions establishing the procedures for submission of fee applications.

■ The issue of our duties in reference to these Applications is our first subject of discussion. The Applicants concede that we are obliged to independently review applications of professionals submitted pursuant to 11 U.S.C. § 330(a)(1), whether objections are raised thereto or not. *See In re J.A. & L.C. Brown Co.,* 75 B.R. 539, 539–40 (E.D.Pa.1987). However, they point out that applications of professionals pursuant to § 330(a) are allowable as administrative expenses under 11 U.S.C. § 503(b)(2).

Judge McGlynn has held that the Applications for compensation in issue, following principally *In re Evans Products Co.,* 62 B.R. 579, 582–83 (S.D.Fla.1986), were allowable under 11 U.S.C. § 503(b)(1)(A). The Applicants contend that this distinction is highly significant. Cited are several cases which hold that the duties of Committee secretaries are "ministerial or mechanical" and that hence the Secretary is not a "professional."[2] *In re Century Machine Tools, Inc.,* 43 B.R. 122, 125 (S.D.Fla.1984); *In re Attorneys Office Management, Inc.,* 40 B.R. 127, 129–30 (Bankr.C.D.Cal.1984); and *In re Barsky,* 17 B.R. 396, 397 (Bankr. E.D.Pa.1982). The Applicants also quote a passage in *Evans Products* stating that, rather than requiring a "substantial contribution" from committee members as is required by § 503(b)(3)(D), such tasks "are presumed to be expenses incurred towards the betterment of the estate and to the benefit of the estate." 62 B.R. at 853. The applicants apparently believe that this presumption shields their applications from court scrutiny.

The proposition advanced by the Applicants—that the court must scrutinize the requests for compensation of *only* professionals and not their Applications, because they are not professionals—does not seem very logical.[3] Any awards of compensation to any persons, professionals or not, from assets of the estate, even to creditor representatives, diminishes the assets available for distribution to the creditor-body as a whole. Examination of general principles applicable to claims under § 503(b)(1) and the authorities cited by the Applicants reveal that, indeed, the Applicants' remarkable proposition that they must be treated differently than "mere" professionals cannot be sustained.

Administrative expenses, given as they are a first priority in distribution ahead of all creditors' claims, except those accorded

---

**2.** We note that no reasoning is proffered regarding the status of the Members. Clearly, they were not acting as professionals. We are willing to consider the status of all of the Applicants as the same in our analysis.

**3.** As we note hereafter, the Members themselves have voluntarily withdrawn certain requests which they now recognize were inappropriate. *See* page 755 & n. 5 *infra.* Under the reasoning herein advanced by them, we would nevertheless have been powerless to reduce the full amount which these parties originally sought!

super-priority status, *see* 11 U.S.C. § 507(a)(1), are traditionally limited to "actual and necessary costs and expenses of preserving the estate after the filing of the petition." 4 COLLIER ON BANKRUPTCY, ¶ 503.03, at 503–14 (15th ed. 1989). Moreover, the terms "actual" and "necessary," which themselves appear in § 503(b)(1)(A), "must be observed with scrupulous care." *Id.*, ¶ 503.04, at 503–23.

We have consistently held that § 503(b)(1)(A) must be "read narrowly" to preserve the debtor's scarce resources for absolutely necessary purposes in order to provide the debtor the best possible opportunity for a successful rehabilitation which will work to the ultimate benefit of all creditors. *See In re American International Airways, Inc.*, 77 B.R. 490, 494–95 (Bankr.E.D.Pa.1987); and *In re Grant Broadcasting of Philadelphia, Inc.*, 71 B.R. 891, 897–98 (Bankr.E.D.Pa.1987). *Accord, e.g., In re Dant & Russell, Inc.*, 853 F.2d 700, 706–07 (9th Cir.1988); *Trustees of Amalgamated Insurance Fund v. McFarlin's, Inc.*, 789 F.2d 98, 101 (2d Cir.1986); *Southern Railway Co. v. Johnson Bronze Co.*, 758 F.2d 137, 140–43 (3d Cir.1985); and *In re Fred Swain, Inc.*, 97 B.R. 660, 661 (Bankr.S.D.Fla.1989).

Therefore, as we read § 503(b), court scrutiny is implicitly required as to *all* administrative claims allowable pursuant thereto. This is particularly true of claims under § 503(b)(1)(A). The scrutiny required under § 330(a)(2) to make certain that claims under § 503(b)(2) are "actual, necessary expenses" would therefore appear to be identical to that required to allow "actual, necessary costs and expenses" under § 503(b)(1)(A).

None of the cases cited by the Applicants support the notion that courts should not scrutinize the applications of creditors' committee officers and members for compensation. The *Century Machine* court concludes that the committee secretary in issue there performed his duties as a "professional person," 43 B.R. at 125, and hence was subject to § 330(a)(2). The *Attorneys Office Management* decision involved the issue of whether a firm which performed services for individual creditors could also act as committee secretary. The court allowed the firm to do so, but only because it concluded that the tasks of a committee secretary were not only so ministerial as to not be considered those of a "professional person," 40 B.R. at 129–30, but also to preclude any compensation whatsoever for such services from the estate. 40 B.R. at 129. This is hardly the result sought by the Secretary here. The comments of Judge King in *Barsky* were made in the context of denial of compensation to counsel for the creditors' committee for services which appeared to be the province of the committee secretary. Hence, compensation for the services for which compensation is sought here were disallowed in *Barsky*.

Finally, the *Evans Products* case, which the Applicants argue that Judge McGlynn followed, concludes with the statement that a committee member "must make some showing to the bankruptcy judge so that the judge can distill those expenses that are not reimbursable from those that are." 62 B.R. at 583. The "presumption" of betterment to the estate by a committee member's services is therefore clearly not irrebuttable in the eyes of the *Evans Products* court, as the Applications here apparently argue.

■ It is therefore clear that scrutiny of the Applications in issue here is necessary. We also conclude that our Order of April 27, 1989, holding the Applicants to the same standards as professionals in submission of applications for compensation was entirely appropriate. We shall therefore scrutinize these Amended Applications to see how they measure up to the same standards of *Meade Land, Mayflower,* and *Metro Transportation, supra,* to which we have held that all professionals, *see, e.g., In re 31–33 Corp.*, 100 B.R. 744, 746–47 (Bankr.E.D.Pa. 1989), and trustees, *see In re Greenley Energy Holdings of PA, Inc.*, 94 B.R. 854, 857–58 (Bankr.E.D.Pa.1989), and thus all parties requesting compensation out of the estate proceeds, must comply.

We first turn to the Secretary's Application. The dates, descriptions of services, and hours expended appear identical to the Secretary's earlier submission, as are the sums demanded, $5,958.25 as compensation for services and $325.00 for three items of costs, disclosed only as "POSTAGE AND MAILING" ($150), "TELEPHONE CALLS" ($125), and "MEALS" ($50).

We will accept the statement of the Applicants' counsel that the total hours expended by the Secretary itemized in his application compute to 47 hours, 40 minutes. The Secretary, without reciting any basis, now tells us that he computed his hourly rate as $125 per hour. This rate of compensation, given that it computed to the full amount of compensation sought to be recovered by the Secretary, is, of course, most convenient.

 The first issue is how we determine whether $125 per hour is an appropriate rate of compensation for the Secretary. In the case of attorneys, and, we believe, all professionals, the starting point of calculation is the "normal billing rate" of that professional. *See In re Fine Paper Antitrust Litigation,* 751 F.2d 562, 590–91 (3d Cir.1984); *Meade Land, supra,* 527 F.2d at 283; and *Lindy Bros. Builders, Inc. v. American Radiator & Standard Sanitary Corp.,* 487 F.2d 161, 167–69 (3d Cir.1973). The burden of proof is upon the applicant to present his "normal billing rate," *see In re Sly,* 77 B.R. 115, 118 (Bankr.N.D.Ohio 1986), and then to convince us that this rate is appropriately applied in the case in point. *See In re Shaffer–Gordon Associates, Inc.,* 68 B.R. 344, 350–51 (Bankr.E.D.Pa.1986).

The Secretary here has advanced absolutely nothing to meet his burden, even after our specific directive that he comply with, *e.g., Meade Land.* We would therefore be justified in denying his Application entirely on this basis.

However, instead we have attempted to carefully review the Application and attempt to measure the value of these services. We agree with the Secretary's own assessment that his tasks were ministerial. *Accord, Attorneys Office Management, supra,* 40 B.R. at 129–30. The services of the Secretary here are clearly more likened to those of a legal secretary in a law firm than to, for example, a federal cabinet member, *e.g.,* the "Secretary" of State. We note that secretarial tasks are, when requested by professional firms, consistently viewed as so ministerial as to be considered overhead. *See, e.g., Meade Land,* 527 F.2d at 284; *In re Motor Freight Express,* 80 B.R. 44, 47 (Bankr.E.D.Pa.1987); *Metro Transportation, supra,* 78 B.R. at 419; and *In re Amatex Corp.,* 70 B.R. 624, 627 (Bankr.E.D.Pa.1985).

In the relatively rare instances where compensation of non-attorneys, such as paralegals, has surfaced as an issue, it is apparent that the rates of compensation allowed are very modest. *See In re First Software Corp.,* 79 B.R. 108, 123 (Bankr.D. Mass.1987) (paralegals normally not allowed more than $30 per hour); and *In re Factory Tire Distributors, Inc.,* 71 B.R. 723, 728 (Bankr.W.D.Pa.1987) ("We ... compensate paralegals at $20 per hour— not $40 per hour").

The Applicants have not cited any cases to us involving rates of compensation allowed to either Committee Secretaries or legal secretaries, which is not surprising, since such parties have rarely been compensated at all. We doubt that rates for compensation of legal secretaries would exceed those of most paralegals. We have therefore exercised extreme liberality in deciding to award the Secretary a $50.00 hourly rate, a figure that we believe would be the envy of every legal secretary in our community.

 We are also compelled to strike certain entries on the Secretary's Application. Services totalling six hours and one minute were performed not only prior to the Secretary's appointment on September 23, 1983, but prior to his application for appointment on September 9, 1983. Pre-appointment services are impermissible unless specific appointment *nunc pro tunc* allowing same is authorized. *See, e.g., In re F/S Airlease II, Inc. v. Simon,* 844 F.2d 99, 105–08 (3d Cir.1988); *In re Arkansas Co.,* 798 F.2d 645, 646, 648–50 (3d Cir.1986); and *In re TM Carlton House Partners, Ltd.,* 93 B.R. 875, 876–77 (Bankr.E.D.Pa.

1988). One hour, 20 minutes was spent on matters in connection with the fee application (see entries of November 17, 1983; November 18, 1983; May 6, 1984; and June 29, 1984). Such time is not compensable from the funds of debtor-estates. *See J.A. & L.C. Brown, supra,* 75 B.R. at 540; and *Shaffer–Gordon, supra,* 68 B.R. at 348–50.

■ We shall therefore allow the Secretary to recover, for purposes of rounding off, compensation for services for 40 hours of the 47 hours, 40 minutes claimed, at $50 per hour, or a total of $2,000. In so concluding, we have been very liberal in evaluating the remainder of the fee Application. Many of the entries reference conversations with individuals without reciting the specific purpose therefor. Such entries would normally be disallowed in their entirety. *See, e.g., Meade Land, supra,* 527 F.2d at 282–84; *Mayflower, supra,* 78 B.R. at 47; and *Amatex, supra,* 70 B.R. at 627–28. We will allow them here only because the hourly rate allowed is, relative to professionals, modest. Entries such as mailing out notices would be disallowed if we considered the services of the Secretary to be in the realm of a professional. However, in light of our reduction of the hourly rate to a standard appropriate for a party performing ministerial tasks, we are willing to allow the Secretary to obtain compensation for performing ministerial tasks. Many of the entries would, however, be reduced or disallowed if we compensated the Secretary at his requested rate of $125 per hour, which is appropriate for a professional.

■ The request for costs, while setting forth a rather modest bottom-line figure of $325.00, is, as the Untied States Trustee pointed out, totally out of compliance with *Metro Transportation,* 78 B.R. at 420; and *Mayflower, supra,* 78 B.R. at 47–48, despite the specific statement in our Order of April 27, 1989, that the guidelines in those cases *must* be followed. Specifically, no receipts for the postage costs, telephone costs, and transportation appear. Nor can it be ascertained to what specific undertakings these requests for compensa-

tion relate. The requests are for such round numbers that their accuracy is suspect. While we would clearly be justified in denying this entire request, in light of the foregoing, we are inclined to allow a $150 "compromise" figure, much as we did in *Metro Transportation, supra,* 78 B.R. at 419.

■ We now turn to the Members' requests for compensation. The striking feature of these submissions, in contrast to the Secretary's failure to supplement his Application despite the intervention of our Order of April 27, 1989, is their variance from the previous submissions of the Members on November 14, 1985.

Blue originally sought air fare, from Greensboro, North Carolina, for three meetings, totalling $693.00. It now concedes that, two of the meetings being pre-petition, it is only entitled to one fare of $257.00 to attend a Committee meeting on October 31, 1983.[4] It also includes, for the first time, additional entries for transportation, lodging, tips, meals, and phone totalling $153.38. In lieu of receipts, *see Metro Transportation, supra,* 78 B.R. at 420; and *Mayflower, supra,* 78 B.R. at 47–48, we were provided with copies of Blue's letter to the Secretary and Blue's internal reimbursement vouchers attached to its original Application. We do not consider these documents adequate substitutes for receipts. We are disinclined to allow items of costs not requested previously which are far in excess of those requested by the other Members for the same matters. We shall therefore confine Blue's allowance to $257.00.

Health, located in Cumberland, Rhode Island, has, like Blue, reduced its transportation claim from that for three meetings, at $866.80, to $278.60, the cost of transportation to only the October 31, 1983, meeting. Despite the absence of receipts (only a letter to the Secretary is submitted for this purpose), we will allow the $278.60 sum requested. We observe that, unlike Blue, this is the only sum presently requested by Health.

---

**4.** We note that, had we adhered to the principle suggested by the Applicants that we were not empowered to review these requests, we would have been obliged to compensate Blue for all of the sums originally demanded by it, including these now admittedly inappropriate requests.

Calabash, located in New York City, has scaled down a previous request of $100.75 to $50.37. No receipts are enclosed; and the entries on the previous request are halved without explanation, suggesting that the earlier demand included costs expended on behalf of a companion.[5] Despite our reservations, the figure now requested is sufficiently modest that we will allow it.

Tulip, making a far shorter trip than Calabash from Reading, Pennsylvania, has excised $63.30 arising from a pre-petition meeting from a previous claim for $134.53, and has now submitted a totally undocumented demand for $71.23. The greater part of this is $41.63 for "meals." This figure is completely out of line with the requests of the other Members as compensation for meals. Without some support for the assertion that this figure is reasonable, we suspect that it may represent an attempt to have the estate pick up the tab for a lavish dinner in the "big city." We will reduce this party's total allowance to $50.00.

An Order consistent with this Opinion will be entered.

---

**5.** *See* page 754 & n. 4 *supra.* It is readily apparent that an "honor system" in such matters is unworkable.