**In re JEFSABA, INC., Debtor.**

**Bankruptcy No. 91–23043 DWS.**

United States Bankruptcy Court,
E.D. Pennsylvania.

Sept. 28, 1994.

Charles Golden, Edmond M. George, Obermeyer, Rebmann, Maxwell & Hippel, Philadelphia, PA, for debtor.

Gary D. Bressler, Leon Barson, Adelman, Lavine, Gold & Levin, Philadelphia, PA, for committee for Unsecured Creditors.

Michael Kaliner, Chapter 7 Trustee, Fairless Hills, PA.

Joseph Minni, U.S. Trustee, Philadelphia, PA.

## OPINION

DIANE WEISS SIGMUND, Bankruptcy Judge.

Before this Court are the contested fee applications of various professionals who provided services in the above bankruptcy case.[1] Applying for approval of fees and reimbursement of expenses are counsel to the Debtor, Obermeyer, Rebmann, Maxwell and Hippel ("Obermeyer"); counsel to the Committee for Unsecured Creditors (the "Committee"), Adelman, Lavine, Gold and Levin ("Adelman"); appraiser for the Committee, Reaves Lukens Company ("Lukens"); accountant to the Committee, Concannon, Gallagher, Miller and Co. ("Concannon"); and Debtor's management company, S.L.G. ("S.L.G.").

### BACKGROUND

Jefsaba, Inc., trading as "Holiday Inn of New Hope", filed a voluntary petition for

---

1. This bankruptcy case, originally assigned to the docket of the Honorable Thomas M. Twardowski, was transferred on November 16, 1993, to the docket of the Honorable Diane W. Sigmund as part of the case reassignment program implemented upon the appointment of two new bankruptcy judges for the Eastern District of Pennsylvania.

relief under Chapter 11 of the United States Bankruptcy Code (the "Code") on August 26, 1991. Although efforts were made to restructure the business and its obligations to both secured and unsecured creditors, each of the Debtor's three proposed plans [2] failed to obtain confirmation. The Chapter 11 case was converted to a case under Chapter 7 by Order dated May 17, 1994.

Hearings on the fee applications and objections were held before Judge Twardowski on December 15, 1992 and July 13, 1993. Prior to and following the reassignment of this case, the parties were attempting to negotiate a settlement of these and various other pending motions, all of which have now been resolved other than these applications. Because the record on these matters was made before another bankruptcy judge, a series of status conferences were held to ascertain, *inter alia,* whether any applicant wished to supplement the record. None did. Additionally, the parties were asked to submit to the Court a listing of the pleadings, exhibits, testimony and briefs they are relying upon in support of their applications and objections.

## DISCUSSION

■ This case provides the Court with its first significant opportunity to present its views on issues relating to fee applications. While the issues we address were in this case raised by the parties' objections, they are the issues we would consider in the exercise of our independent duty to review fee applications as recently pronounced by the Third Circuit Court of Appeals in *In re Busy Beaver Building Centers, Inc.,* 19 F.3d 833, 841 (3d Cir.1994).[3] This duty has compelled us in·certain circumstances here to go beyond matters raised by the parties' objections.

Although the following is a detailed discussion of our views on various compensation issues, our statements herein are not to be

construed as hard and fast rules. Examples used are merely for illustration and are not intended to be inclusive or exclusive, or without exception in the appropriate situation. Each application must be considered on a case by case basis in light of its particular facts and circumstances. Innumerable factors present in any one case are liable to produce differing results on seemingly similar issues.

### I.

### The Standard for Assessing the Reasonableness of Fees.

■ **A. Hourly Rates.** Here, as in other cases, parties have objected to the hourly rates charged by certain of the professionals as excessive. We reject any *per se* rule that establishes an inflexible cap on allowable rates. Instead, a determination that the requested fees are reasonable requires a two-step process. First, the Court must consider the experience and skill of the professionals in the case. Having done so, the Court must then ask whether the requested fees comport with the market cost for a professional with such experience and skills.

■ Articulating this approach is far easier than implementing it. While it may be relatively easy to ascertain the experience and skill of a professional based on information contained in the retention application and performance before the Court, our inquiry does not end there. This Court will scrutinize whether the appropriate professional or paraprofessional is assigned to the various tasks performed. We review fee applications paying particular attention to the level of professional (senior partner, junior partner, associate, paraprofessional), billing time *viz a viz* the complexity of the task being performed. The nature, extent and complexity

---

**2.** The first plan was filed on February 25, 1992 and was followed by amended plans filed on April 6, 1992 and August 9, 1993.

**3.** The Court of Appeals determined that this duty arises not from the Bankruptcy Code but "from the court's inherent obligation to monitor the debtor's estate and to serve the public interest."

*Id.* Moreover, the potential for conflict between attorneys seeking compensation under § 330 and their clients imposes upon the bankruptcy court "an independent duty to scrutinize fee applications." *Id.* (citation omitted).

of the task at hand determines the level of professional or paraprofessional who should perform the task, and, consequently, the reasonableness of the fees charged for the services. *Id.* at 852–53. It is unreasonable for a senior attorney to perform routine tasks such as preparing a debtor's schedules and statements, drafting a simple motion, or coordinating exhibits for a trial. These are tasks that a junior associate or even a paralegal can adequately perform.[4] Consequently, fees charged at a senior attorney's hourly rate for such services are unreasonable. *See Lindy Bros. Builders, Inc. v. American Radiator & Std. Sanitary Corp.,* 487 F.2d 161, 167 (3d Cir.1973) (stating "the court may find that the reasonable rate of compensation [for the same person] differs for different activities"), appeal after remand, 540 F.2d 102 (3d Cir.1976) (en banc). *See also, In re Fine Paper Antitrust Litigation,* 751 F.2d 562, 591 (3d Cir.1984) (same). As the *Busy Beaver* Court observed:

> At least absent justifying circumstances (such as time pressures not brought on by a lack of diligence, the excusable non-availability of a less experienced employee, or an inability to delegate the task efficiently, perhaps because the learning curve renders effective delegation infeasible), "[w]hen an experienced attorney does clerk's work, he or she should be paid clerk's wages." *In re Vogue,* 92 B.R. [717] at 718 [ (Bkrtcy.E.D.Mich.1988) ]. Section 330(a) is not coy about this matter, but states expressly that how much compensation is reasonable depends on the nature and value of the services, as measured by the cost of comparable services.

*Id.* at 855.

■ We recognize that our general requirement that the appropriate level of person be matched to the task at hand is not without exception. As noted by the Court of Appeals in *Busy Beaver,* there are justifying circumstances that require relaxation of this rule. Bankruptcy courts in setting fees un-

der § 330 should allow professionals the same leeway in the types of tasks billed for as clients would ordinarily allow in a non-bankruptcy setting. *Id.* However, we will look to professionals seeking compensation under § 330 to exercise common sense and "billing judgment" and to make clear in their fee applications when these justifying circumstances have arisen.

■ In determining the reasonableness of fees requested under § 330, the Court of Appeals in *Busy Beaver* applied a market approach in which the court acts as a "surrogate for the estate, reviewing fee applications much as a sophisticated non-bankruptcy client would review a legal bill." *Id.* at 848. The market driven approach of § 330(a) allows compensation for legal, paralegal, and other services, including clerical services, "if and only if analogous non-bankruptcy clients agree to pay for the same, and then only at that rate." *Id.* at 852 (footnote omitted).

The Court of Appeals provided guidance to us in noting that the starting point of our analysis of an appropriate market rate is our "experience with fee petitions" and our "expert judgment pertaining to appropriate billing practices, founded on an understanding of the legal profession." *Id.* at 854.

> A bankruptcy judge should use his or her experience and expertise to locate the questionable charges and fees, and once having questioned a charge or fee may properly require the applicant to prove the market would recompense him or her for the charge.

*Id.* One resource that the judge has in making rate determinations is his or her knowledge of the hourly rates charged by other professionals seeking fee awards in our court. This approach was utilized by our colleague Chief Judge Scholl in *In re Dubin Paper Company, et al.,* 169 B.R. 115, 123–24 (Bankr.E.D.Pa.1994). There the Court reviewed the hourly rates of attorneys who graduated from law school the same year as

---

4. We wholeheartedly encourage the use of paralegals and other paraprofessionals in order to insure the efficient and economical use of time. *Busy Beaver,* 19 F.3d at 852–53.

the various attorneys seeking compensation in that case and calculated the average hourly rate of all the attorneys in the sample group.[5] Because the requested rates all exceeded the average rate, the court refused to reconsider an earlier order in which it reduced the requested rates. *Id.* at 123–24.

■ We agree with Judge Scholl that "a degree of caution must be employed in utilizing the comparable fee data" approach. *Id.* at 125. A comparable fee data approach is susceptible to bias depending upon the members of the sampling. Not all attorneys who graduated from law school in the same year have the same experience, knowledge, or ability and, therefore, are not readily comparable. In particular, we recognize that certain professionals and professional firms, large and small, are retained because of their experience in handling complex or specialized matters and the hourly rates of those professionals may appropriately deviate from the rates of professionals of the same vintage.[6] Notwithstanding the limitations of this approach, comparative rate information is a useful barometer in our analysis.

■ The starting point for the calculation of fees is the applicant's "normal billing rate." *Lindy Brothers Builders,* 487 F.2d at 167; *In re Jennings,* 100 B.R. 749,

'753 (Bankr.E.D.Pa.1989). Generally, so long as the rates being charged are the applicant's normal rates charged in bankruptcy and non-bankruptcy matters alike, they will be afforded a presumption of reasonableness. Notwithstanding this presumption, the Court will examine the requested rates, considering the experience, knowledge, ability and reputation of the applicant, to make sure that the rates are not "out of line" with comparable rates in the market. To the extent a professional's normal hourly rate deviates from this market norm, he or she should be prepared to prove that the market would recompense him or her for that charge. *Jennings, id.*

■ **B. Reasonableness and Necessity of Time.** Just as the hourly rates charged must be reasonable, so must the time spent by the professionals on the various tasks to be performed. *See* § 330(a). It is well-settled in this district that excessive or unnecessary time is not compensable. *See, e.g., In re St. Joseph's Hospital,* 102 B.R. 416, 418 (Bankr.E.D.Pa.1989). The time spent must reflect the importance of the task being performed. In determining whether the amount of time expended is reasonable, the Court draws on its experience and knowledge of the time required for similar matters. The Court also expects the

---

**5.** The Court rejected the sampling of attorney rates provided by the applicant in favor of its own compilation of actual requests by counsel in applications filed and ruled upon by him in 1994.

**6.** As the *Busy Beaver* Court observed:

The above mentioned principle of responsible billing applies not only to the selection of which classification of employee within a law firm should perform a given task, but also to what genre of law firm should represent the debtor. A run-of-the-mill bankruptcy case does not warrant the lofty fees of nationally-renowned law firms, *see In re Vogue,* 92 B.R. at 718, and a reasonable debtor concerned with the economical administration of the estate in such a case would refrain from retaining over-qualified counsel. In other words, the reasonable hourly rate has a cap based on the expected and actual complexity of the case, a cap which, while flexible, should stave off clear abuses. *Compare In re Waldoff's Inc.,* 132 B.R. 329, 335 (Bankr.S.D.Miss.1991) (substantially reducing out-of-state counsel's fees to match

prevailing local rates because the complexities of the case did not warrant retention of a law firm charging counsel's requested rates) *and In re Casull,* 139 B.R. 525, 528 (Bankr.D.Colo. 1992) (reducing fees found excessive "considering the nature and complexity of the issues dealt with") *with In re Robertson Cos.,* 123 B.R. 616, 619 (Bankr.D.N.D.1990) (awarding out-of-state law firm its locally prevailing rate, which far exceeded local bankruptcy rates, in light of the size and complexity of the case) *and In re Frontier Airlines, Inc.,* 74 B.R. 973, 976–77 (Bankr.D.Colo.1987) (same). To be fair to the professional, the court should dispose of this problem as early as practical, preferably before the debtor retains the professional.

*Id.* at 856 n. 35. In order to address this issue early on as the Court of Appeals suggests, the professional should file a schedule of the hourly rates of persons expected to provide services in the case with its retention application. In that way, interested parties and the Court may review at the outset the appropriateness of the professionals sought to be employed.

time expended to be commensurate with the anticipated benefit to the estate and that unproductive time will be written off. (*See infra* part I.C.).

 Determining whether the time spent is reasonable can be a difficult and burdensome task for a bankruptcy judge. In the first place, many of the activities do not occur in the court's presence. In the second place, the presentation of services performed in a chronological manner as contemplated by our current local rules of bankruptcy procedure in many cases does not facilitate an informed judgment. Moreover, as the Court of Appeals has stressed, it does

> not intend that a district [or bankruptcy] court, in setting an attorney['s] fee, become enmeshed in a meticulous analysis of every detailed facet of the professional representation. It ... is not our intention that the inquiry into the adequacy of the fee assume massive proportions, perhaps even dwarfing the case in chief.

*Id.* at 845. Accordingly and consistent with *Busy Beaver,* our approach after determining that there is sufficient detail to understand the nature of the professional task performed is to analyze the reasonableness of the larger time entries and the aggregate time for a given project.[7] This review is facilitated when the applicants provide a summary of the time by project (e.g., reorganization planning, preference litigation, motion for appointment of trustee) to supplement the chronological presentation required by Local Bankruptcy Rule 2002.2. While such a summary is presently only required in this district where applications request fees in excess of $100,000, we believe this information is easily susceptible to compilation through recent technological advances and we would favor lowering that threshold to make the information mandatory in most Chapter 11

cases. With project billing information, we believe the number of questions the court would have on a given application would be reduced and the scheduling of fee hearings in some cases where they are presently being held could be eliminated. While we are not now prepared to impose this requirement on professionals absent a rule change or district-wide guideline,[8] we would welcome the receipt of this information, especially where the fees requested exceed $25,000.

**C. Benefit to the Debtor or the Estate.** Certain of the objections in this case, and others, focus on whether the services performed benefit the debtor and/or the estate and if so, whether that benefit is commensurate with the cost of the services performed. Additionally, objectors often argue that services which do not produce a tangible benefit to the debtor or the estate (i.e., a confirmed plan, a successful litigation) are not compensable.

 In the first place, we do not conclude that only successful actions may be compensated under § 330. To the contrary, so long as there was a reasonable chance of success which outweighed the cost in pursuing the action, the fees relating thereto are compensable. Moreover, professionals must often perform significant work in making the determination whether a particular course of action could be successful. Such services are also compensable so long as, at the outset, it was not clear that success was remote.

Generally, in a non-bankruptcy matter, the professionals discuss the alternative strategies with the client, they weigh the chances of success, and the client then authorizes the legal work to be performed. The client usually makes this decision using a cost/benefit analysis comparing the chances of success to the costs of pursuing the course of conduct.

---

7. Sampling parts of the application and applying the findings to the entire application is a useful procedure employed by a number of bankruptcy judges. *See* Alan Hirsch and Diane Sheehey, Federal Judicial Center, *Awarding Attorneys' Fees and Managing Fee Litigation* 96–97 (1994).

8. We note that the bar in conjunction with the Court has embarked upon a review of our local bankruptcy rules. In order to promote uniformity within the district, we await the outcome of this effort, recognizing that in appropriate cases we may order project billing records to be maintained.

The same exchange and cost/benefit analysis often does not take place in a bankruptcy case. The "legal market," as the *Busy Beaver* Court observed, "functions imperfectly in bankruptcy, as the debtor 'client' and other interested parties are often unable or unwilling to contest the fees charged." *Id.* at 848. *See id.* at 842–43. In a bankruptcy case, the professional, not the client, is more likely to direct the case and decide which courses of action to undertake. This is especially true of the committee of unsecured creditors that is less accessible to guide counsel in determining the issues in which it should become involved. Since committee counsel is paid from the estate as opposed to directly by any member, there is less inclination for each member to exercise control over fees even though the more monies that are paid to professionals, including its own attorney, the less will be available for distribution to the creditors.

■ As suggested by the Court of Appeals in *Busy Beaver*, when reviewing fee applications, we "will, in practical terms, act as a surrogate for the estate, reviewing fee applications much as a sophisticated non-bankruptcy client would review a legal bill." *Id.* at 848. Accordingly, we expect that professionals seeking compensation from the estate will in the first instance ask themselves whether a non-bankruptcy client applying a cost/benefit analysis would undertake the contemplated course of action.

■ **D. Multiple Attorneys Performing the Same Task.** Another common objection to fee applications is that two or more professionals from the same firm or company each performed, and billed for, the same work. This type of objection raises several issues. First, related to the principle that the right professional should perform the right task, is the principle that the fewest number of professionals necessary should be assigned to each bankruptcy case [9] and perform each task. This is not to suggest that if two professionals working together can perform the task more efficiently and economically than one alone can, two professionals should not be used and compensated. Moreover, we have no particular objection to one professional performing the work and a second professional reviewing the work product and offering comments and suggestions, especially where that second person brings a different expertise to the matter. Such an exchange of experience and knowledge between professionals within the same firm or company makes best use of each professional's abilities and is one of the benefits of multi-person firms.

■ Further, in light of our strong support for the use of paralegals and associates, we recognize the need for intraoffice conferences so that matters can be discussed and assignments made and reviewed. All *participants* may bill for the time spent in the intraoffice conferences with the caveat that the normal requirements of specificity, discussed later herein, and reasonableness apply.

However, when more than one professional is working on the same matter, communication and coordination is required. One person must be aware of what everyone is doing or unnecessary duplication of work will result. For example, if the debtor intends to file several preference complaints, research of the law concerning preferences need only be performed once. Associates drafting the later complaints should use the research performed earlier in the case, and use the earlier complaints as a form, if applicable. Professionals should not "reinvent the wheel" each time the same or a similar task is performed.

■ The compensation of multiple professionals is obviously inappropriate

---

**9.** Requests to compensate for services of professionals whose time is *de minimis* raises a red flag in our review. Other than professionals with a special expertise, the fleeting involvement of bankruptcy attorneys in a case often results from a staffing inefficiency. Given the itinerant attorney's lack of knowledge of the case, the attorney's time may be less productive than attorneys regularly assigned to the case. When this occurs, we would expect an appropriate deduction be made to the time charged.

where the second professional is involved purely for his or her education. While all young professionals must be trained, it should not be at the expense of the estate and other creditors. If two or more professionals are billing time, they each should make a contribution. One place where this has been a particular problem is when more than one professional attends a hearing. In such a situation, we expect all of the professionals attending to have a role.

■ Further, each time a firm makes a personnel decision, i.e., changes the professionals working on a particular matter, the estate should not bear the burden of the new addition's learning curve. It is inappropriate for each new addition to the team to bill for time spent reviewing the file or otherwise familiarizing him or herself with the matter.

■ In the instant matter, we see a slightly different twist to the objection of multiple attorney time. Here, the objection is that counsel for the Debtor and the Committee each performed, and billed for, the same work. As a general proposition, professionals representing different parties may all be involved in the same matter or project and receive compensation for their time so long as they are seeking to protect legitimate and disparate interests. However, if counsel for different parties are working on a consensual plan or sale or advocating the same interest in litigation, and, thereby, their clients share the same goals, they should coordinate their efforts so that the work is not duplicative.

## II.

### Specificity; Billing Increments.

■ It is well-settled in this circuit that only time entries separately listed and explained in detail are compensable. *See In re Meade Land and Development Co., Inc.*, 527 F.2d 280, 283 (3d Cir.1975); *In re Mayflower*

*Associates,* 78 B.R. 41, 48 (Bankr.E.D.Pa. 1987). Local Bankruptcy Rule 2002.2(a) sets forth the *minimum* requirements relating to specificity. Lumped time and entries without sufficient explanation will not be allowed.

■ Further, all time should be recorded in increments of one-tenth of one hour or six minutes. As stated by one bankruptcy court, "minimum charges of .10–hour increments more fairly reflect actual time involved, than do quarter hour segments." *In re Corporacion de Servicios Medico–Hospitalarios de Fajardo, Inc.*, 155 B.R. 1, 2 (Bankr.D.P.R. 1993). Similarly, the bankruptcy court in *In re Price*, 143 B.R. 190, 194 (Bankr.N.D.Ill. 1992) stated that the attorney's practice of billing in quarter hour increments "inherently inflates and distorts the time actually expended, and hence is unacceptable." (citations omitted). In *In re St. Joseph's Hospital*, 102 B.R. 416, 418 (Bankr.E.D.Pa.1989), Chief Judge David A. Scholl referred to billing in one-tenth of an hour increments as "normal" and stated that to do otherwise "suggests the opportunity for padding on short tasks." [10] *See also In re Speeds Billiards & Games, Inc.*, 149 B.R. 434, 440 n. 4 (Bankr.E.D.Tex.1993); *In re Gillett Holdings, Inc.*, 143 B.R. 256, 261 (Bankr.D.Colo. 1992); *In re Adventist Living Centers, Inc.*, 137 B.R. 692, 699 (Bankr.N.D.Ill.1991); *In re Hillsborough Holdings Corporation*, 125 B.R. 837, 840 (Bankr.M.D.Fla.1991); *In re Mortgage & Realty Trust*, 123 B.R. 626, 633 (Bankr.C.D.Cal.1991). Given the ease with which time can be recorded and managed by computer, it is not a burden to require precise recording of time. Professionals who choose not to record their time in such a fashion are making a business decision not to accept work for which approval under Code §§ 327 and 330 is required.

## III.

### Compensation for Preparing Fee Applications.

■ We join our fellow Judges in this district who have refused to award compen-

---

**10.** Judge Scholl further stated that billing in increments greater than one-tenth of an hour often causes the court to make an overall downward adjustment to the requested fees. In that particular case, Judge Scholl did not make a down-

ward adjustment notwithstanding the fact that time was billed in quarter hour increments because his other reductions were so substantial. *Id.*

sation for preparation of fee applications under the Code in all but extraordinary circumstances. *See In re Ross,* 135 B.R. 230 (Bankr.E.D.Pa.1991) (Fox, J.); *In re Shaffer–Gordon Associates, Inc.,* 68 B.R. 344 (Bankr.E.D.Pa.1986) (Scholl, C.J.). This policy underscores our general belief that counsel is protecting its "personal interests" in preparing a fee application rather than providing a "benefit to the estate." *See Shaffer–Gordon,* 68 B.R. at 349 (quoting *In re Hotel Associates,* 28 B.R. 332, 334 (Bankr.E.D.Pa. 1983) (King, J.)).

In *In re Alan I.W. Frank Corporation,* 71 B.R. 585, 586 (Bankr.E.D.Pa.1987), Judge Fox compared requests for attorneys' fees in bankruptcy cases to fee awards in "fund-in-court" cases. Since the Third Circuit Court of Appeals has held that time spent on fee applications in such cases is not compensable, *see, e.g., In re Fine Paper Antitrust Litigation,* 751 F.2d 562 (3d Cir.1984), Judge Fox concluded that such time is not compensable under the Code.

This policy is supported by several pre-Code decisions of the Third Circuit Court of Appeals. *See In re Meade Land; In re Imperial "400" National, Inc.,* 432 F.2d 232 (3d Cir.1970); and *United States v. Larchwood Gardens, Inc.,* 420 F.2d 531 (3d Cir. 1970). In *Meade Land,* the Court of Appeals stated that while services devoted to the preparation of fee applications are legal services, "there is a substantial question as to whether they are compensable." 527 F.2d at 285 n. 6 (citing *Larchwood Gardens* ). We note that all three of these circuit court cases were decided under the "strict economy" approach of the Bankruptcy Act which is not part of the Code. However, given the Third Circuit authority for disallowing fee preparation time in non-bankruptcy matters, we have no reason to believe a different rule should govern applications made under the Code.

We recognize that the proper preparation of fee applications can be time consuming. However, due to the availability of computerized billing aids, the task need not be burdensome. In any event given the expanded billing specifications which are demanded in today's competitive private legal market for which private clients are not charged, it would be anomalous to impose the cost of billing on a debtor estate when non-financially distressed clients are not paying for a substantially similar service.

Fees incurred for preparing and pursuing fee applications are too closely tied to the applicant's self-interest and too attenuated from benefit to the estate to merit compensation. While this result may seem harsh, especially where there fee application process is required by the Code and case law, professionals are or should be aware of the fee application requirements and should consider them in their decision whether to accept the employment.

## IV.

### *Expenses.*

■ Just as time entries must be precisely recorded and described, so must entries relating to expenses. "Expenses" is a broad category which includes costs for photocopying, long distance telephone calls, facsimiles, postage, filing fees, travel, computer research and the like. In order to establish a right to reimbursement of expenses, the applicant's requests must be sufficiently detailed to enable the Court to perceive the actual and necessary nature of the expense. "[A] showing of actual and necessary cannot be accomplished merely by listing in the fee application the amount of expenditure next to the type of expenditure." *In re A.I.A., Inc.,* 47 B.R. 716, 725 (Bankr.E.D.Pa.1985), *quoted in In re Metro Transportation Co.,* 107 B.R. 50, 54 (E.D.Pa.1989).

■ Long distance telephone and facsimile charges should be separately listed by call indicating the date of the call or facsimile and the charge. The use of facsimile transmittal, hand deliveries and overnight mail for routine communications is discouraged. With respect to charges for photocopying, the number of copies made and the price per page, not to exceed $.20, *see In re Schwem-*

*mer Hardware Co., Inc.*, 103 B.R. 635, 640 (Bankr.E.D.Pa.1989), should be listed. If an unusually large amount of photocopying has been done, the items copied should be identified along with an explanation of the need for the copying. Travel expense entries should clearly identify who did the travelling, when and where they went, and the charge for the travel at normal rates. Since Code § 330 requires that the expenses be "actual, necessary" expenses, if the expenses are ones which the applicants would have incurred in any event, such as lunch, ordinary secretarial costs, and ordinary transportation, they are not "necessary" and compensation will be denied. Again, the overriding principle is common sense and "billing judgment."

## THE FEE APPLICATIONS

### A. First and Second Fee Applications of Obermeyer, Rebmann, Maxwell & Hippel, Counsel for the Debtor.

Obermeyer requests that the Court approve its First Application to allow $85,927.50 in fees and $12,140.63 in expenses for services rendered from August 12, 1991 to June 30, 1992 (the "First Application").[11] Obermeyer is also seeking an additional $22,-661.63 consisting of fees of $17,514.50 and reimbursement for expenses of $5,146.63 for the period July 1, 1992 to October 31, 1992 (the "Second Application").

Bucks County Bank and Trust Company (the "Bank") and the Official Committee of Unsecured Creditors (the "Committee") raise the following objections to the First and Second Applications:

1. Hourly rates are excessive;

2. Charged for preparation of the fee application;

3. Charged for services rendered prior to appointment;

4. Time for certain activities was excessive, and entries lacked the required specificity;

5. Unnecessary attendance at hearings by multiple attorneys;

6. Excessive fees charged for paralegal;

7. Payment of requested fee prejudices other creditors; and

8. Not all services benefitted the Debtor.

We will consider each of the objections *in seriatim.*

1. Both the Bank and the Committee claim that the hourly rates charged by the attorneys at Obermeyer are excessive. We credit the testimony of Charles Golden, Esquire, a partner at Obermeyer, that Obermeyer does not charge different fees in bankruptcy and non-bankruptcy matters. (Record I at 53). The rates, therefore, enjoy a presumption of reasonableness. Notwithstanding this presumption, we exercise our independent duty to review the hourly rates against the market norm for lawyers of similar experience and training.

The principal actors for the Debtor were Charles Golden and Edmond George. Charles Golden, the senior partner on the engagement, billed at $300 per hour during the periods of the First and Second Applications. We find the hourly rate charged by Mr. Golden to be within the market norm for a lawyer of his skill and experience. For the most part the tasks he performed (determining strategies, advising the client, negotiating with other parties, supervising delegated work) appear to require an attorney of his level of experience. Certain of the tasks for which he billed the estate at the beginning of the case, e.g. gathering information for and preparation of the petition, schedules and statement of affairs, preparation of retention application could have been delegated to a lower billing attorney, such as Mr. George at $175/hour. However, we temper this observation with the recognition that some of the early meetings at which information was gathered would of necessity have required the skills of a senior attorney to ask the right

---

11. By Order dated November 25, 1992, Judge Twardowski ordered the Debtor to pay Obermeyer 40% of its requested fees and expenses "after reduction of its $25,000 retainer" or "40% × $73,068.13."

questions in order to elicit all the pertinent information. Accordingly, we will reduce the hourly rate charged by Mr. Golden for 5 hours of activities that did not require a lawyer of his stature to $175/hour and deduct $625.00.

■ It initially appeared to this Court that the rate of Edmond George, Esquire, a 1986 law school graduate with a LL.M. in taxation, of $175/hour was somewhat "out of line" with the market rate for a lawyer of that experience. For a majority of the time between August 12, 1991 and October 31, 1992, the time during which the services at issue were performed, Mr. George was a fifth year associate. However, Mr. George appears to have been delegated principal responsibility, under the supervision of Mr. Golden, for day to day activities in this case. Given the level of involvement and responsibility he assumed, we do not think a rate of $175/hour is unreasonable.

■ 2. Compensation for time spent preparing the fee application is denied. *See supra* pp. 802–803. Thus, the $1090.50 in fees for preparing and pursuing the Applications will be deducted from Obermeyer's fee request.

■ 3. The Committee and Bank object to Obermeyer's request for payment for services provided prior to the dates of August 26, 1991 and September 6, 1991, the dates Obermeyer's application for appointment was filed and approved, respectively. Appointment is a prerequisite to receipt of compensation. The Court will authorize appointment of professionals *nunc pro tunc* only in extraordinary cases. *See In re F/S Airlease II, Inc. v. Simon*, 844 F.2d 99, 105 (3rd Cir.1988), *cert. denied*, 488 U.S. 852, 109 S.Ct. 137, 102 L.Ed.2d 110 (1988); *In re Arkansas Co.*, 798 F.2d 645, 699 (3d Cir. 1986). Obermeyer urged no extraordinary circumstances warranting the Court's departure from the normal rule; indeed it did not even seek *nunc pro tunc* appointment. Thus, the $2,400 Obermeyer charged for services rendered prior to filing its application

for appointment on August 26, 1991 is denied. Fees for the period during which the retention application was pending will be allowed given the need to commence work immediately and Obermeyer's inability to control when the retention order would be entered by the Court.

■ 4. Both parties also claim that Obermeyer spent excessive time performing certain tasks and that the time entries lacked the required specificity. In particular, they objected to the time billed for "amendment of the plan" arguing that the changes to the plan were minimal and that the time spent amending the plan was excessive. Moreover, they argue that the changes were unsuccessful and therefore do not deserve compensation. We reject the latter contention, i.e., the changes did not result in a confirmable plan and therefore should not be compensated. The mere fact that the desired result was not achieved does not require that compensation be denied so long as at the time the services were rendered, there was a reasonable chance of success.

■ Nor is compensation for the time spent amending the plan denied as excessive. Obermeyer notes that this was a "cram down" plan which involved intensive work by the attorneys involved. (Record I at 56–57). The active involvement of the Committee on plan formulation suggests that it was not the Debtor and its professionals alone that believed that plan confirmation was an achievable goal. Thus, we cannot conclude that the time spent was excessive.

■ The charge that Obermeyer routinely over bills for services such as reviewing letters and making telephone calls is unfounded. Each of the individual entries in the First and Second Applications is specific with regard to the nature of the activity and the objection provides no grounds for believing that the entries are disingenuous with regard to time spent. The Bank, for example, claims that the Obermeyer attorneys "uniformly" charge two tenths of an hour to review routine correspondence. A review of

the Applications reveals otherwise. In both Applications we note many instances where the attorneys billed one tenth of an hour reviewing correspondence. We also note many instances where greater than two tenths of an hour was billed to reviewing correspondence. It does not appear to this Court that Obermeyer has adopted a policy of billing a set amount of time to certain activities.

While we do not find that Debtor's counsel uniformly over billed for telephone calls, one particular telephone call was improperly recorded. On December 30, 1991, Mr. George billed 1.4 hours to a conversation with a representative in the Reading Bankruptcy Court clerk's office regarding an expedited hearing. Obermeyer admits that the proper time entry should have been .1. Obermeyer Memorandum of Law at 10. Consequently, $227.50 will be deducted from the Applications. Otherwise the objection is denied.

■■■■ 5. A valid concern is raised regarding Obermeyer's fees for trial time. The fees requested include charges for multiple attorneys spending large blocks of time attending hearings. Mr. Golden or Lawrence Tabas, Esquire accompanied Mr. George to several hearings before the Court. Mr. Golden testified that based upon "the complexity of the case", and "the degree of litigiousness of the parties," Mr. George's presence was reasonable. (Record I. at 53). Notwithstanding the complexity of a case or the degree of litigiousness between the parties, we require all professionals attending a hearing to have a role. We are aware that when a matter is vigorously contested with multiple parties the negotiations that occur concurrently with the pending hearing may require the efforts of more than one lawyer for the Debtor. Since it is expected that all professionals attending a hearing will be there for a compensable reason, we turn to the Debtor's fee application to corroborate Mr. Golden's testimony that Mr. George was a necessary actor.

■■ Based on the activities detailed in Mr. George's time entries which show Mr. George to have done the discovery and other hearing preparation, it appears that his attendance was indeed necessary at these hearings. Indeed, Mr. George, not the senior partners, appears to be the most necessary party. His time is another matter. Mr. George billed 10.1 hours on December 19, 1991 to "argue exclusivity motion". He was not accompanied by another Obermeyer attorney. The Committee had two lawyers present at this hearing who billed 8 hours each. Unless their time entries are incomplete, we do not understand why there is a disparity of 2.1 hours between Mr. George's time and the other attorneys. Since we believe that even 8 hours (including travel time which was not identified by Mr. George but we assume was included) is high to "argue exclusivity," we will reduce Mr. George's time to that of the other lawyers and deduct 2.1 hours or $367.50.

■■■ The other hearings at issue dealt with the Bank's Motion for Relief from the Stay. A substantial amount of time was spent by the Debtor and Committee professionals with respect to this Motion taking discovery and otherwise preparing for and attending hearings on March 26, March 31 and April 27 and preparing post-hearing submissions.[12] This hearing was obviously the critical event in the case since the relief if granted would have allowed the Bank to foreclose on the real property and the reorganization would have been doomed. Therefore the amount of time devoted to defense of the Motion is understandable. At two of the three hearings, Mr. George went solo. At the hearing on March 26, 1992, Mr. George billed for 12 hours to "attend hearing on relief from stay." On March 31, 1992, Mr. George billed 10.3 hours to attend the presumably continued stay hearing. On April 27, 1992, Mr. Golden accompanied Mr. George and billed 8 hours for "attendance at

---

12. This litigation was the most time consuming event in this case. In order to evaluate the reasonableness of this time, we needed to understand the total time billed to this matter. The presentation of time by project would have alleviated what was an extremely difficult task for the Court. *See supra* pp. 799–800.

hearing on Bank's motion for relief from stay and Debtor's motion to extend period of exclusivity" whereas Mr. George billed 12.4 hours to attend the same hearing. While we believe the staffing of these hearings was appropriate, we do not understand why the time recorded by each attorney for the same event is different.[13] A final hearing was held on June 4, 1992, where Mr. Tabas who had been involved to deal with the Debtor's contempt action against the Bank billed 4 hours for "hearing and settlement negotiations in connection with complaint against Bucks County Bank" and Mr. George billed 12 hours to "attend hearings on motions." Again we do not quarrel with the Debtor's judgment in bringing in a senior litigator to try this matter and can understand the necessity of Mr. George's involvement given his role in the litigation to date but we do not understand the disparity in billing times. Perhaps there are explanations for these discrepancies between attorneys involved in the same matters for the same client but they are not apparent on this record.[14] Since it is Obermeyer's burden to establish that its attorneys were actually performing specific services for the estate during the period in question and their own billing records establish an inconsistency as to the time charged, see, e.g., Metro Transportation, 107 B.R. at 53 ("the burden of proof to show entitlement to fees is, in all fee matters, on the applicant"), we will reduce Mr. George's time to the time charged by the other lawyers and deduct 12.4 hours (4.4 hours for the April 27 hearing and 8 hours for the June 4 hearing) which equates to $2,170.00.

6. For the reasons stated above, we reject the objection to compensation for the services of a paralegal. A review of the Applications shows that the paralegal performed numerous and varied services such as drafting letters, notices, motions, proofs of claim, and affidavits, and communicating with the bankruptcy clerk's office and creditors. This "intermediate professional level" work performed by the paralegal is precisely the type which this Court recognizes as beneficial in reducing costs to the estate. Busy Beaver, 19 F.3d at 852.

We also note that the paralegal billed time to reviewing pleadings and correspondence in connection with filing. While such work may appear to be clerical, we recognize that it is not necessarily so. Hereafter, when professionals or paraprofessionals perform what appears to be clerical work, the fee application should include an explanation of why it was appropriate for such person to perform such services. We will allow the small amount of fees billed by Obermeyer's paralegal to these matters because it appears that the paralegal was using the pleadings and correspondence and, therefore, may have been better able to efficiently and economically organize the materials for the file in order to retrieve its contents. Thus, the application as pertains to fees for the services of the paralegal is approved in full.

7. The Bank claims that payment of the fees requested by Debtor's counsel would "generate a priority over other administrative claims" and that if the fees were paid there would be no recovery for unsecured creditors in this case. To support this claim, the Bank notes that the assets of the estate are approximately $250,000.00 while the administrative claims include $40,000.00 in priority taxes and $92,000.00 in non-professional administrative expenses without regard to the claims for professional fees which total approximately $182,000.00. Bank's Ob-

---

13. This time has been compared to the time recorded for the Committee counsel for the same hearings which also differs. See infra p. 810.

14. One explanation could be a difference in travel time which all of the attorneys in this case have lumped with their court time. Another explanation could be that not all lawyers are appropriately stopping their meters for lunch and other necessary, but uncompensable activities that occur during a full day at the courthouse. Finally, the senior attorneys (Mr. Golden and Mr. Tabas) may have made adjustments to their actual time in the proper exercise of their billing judgment, and not made comparable adjustments to the time of the junior lawyer who more likely bills for all his actual time.

jection to the First Application ¶ 9; Bank's Objection to Second Application ¶ 9. This observation, while true, is not the basis of a proper objection. The Court's role is to establish the allowed amount of the applicant's claim. The Bankruptcy Code establishes the priority of payment of those claims. Code § 502. The fact that the claims of professionals may, when added to other administrative claims of equal priority, exceed the value of the estate, while certainly regrettable, does not mean that the claim should not be allowed.

■ 8. The Bank claims that a majority of the work performed by Obermeyer produced no benefit to the Debtor and that some of the work was performed for the benefit of insiders. In particular, the Bank argues that time spent by Debtor's counsel contesting the Bank's motion for relief from the automatic stay and execution on its writ of possession and challenging Barb–Lin, Inc.'s request for an administrative claim produced no benefit to the Debtor.

■ As stated above, the fact that certain courses of action were ultimately unsuccessful does not mean that they are not compensable. If there was a chance of success at the time the actions were undertaken which outweighed the cost of pursuing the actions, then the fees and expenses thereby incurred are compensable. Here, we have no evidence from which to conclude that at the time Debtor's counsel contested the Bank's motion for relief that there was no chance for success. The fact that the Committee also objected to the Bank's motion for relief indicates that Debtor's counsel was not acting unreasonably. The objection as it relates to Debtor's counsel contesting the Bank's motion for relief is denied.

At the hearing on July 8, 1993, the parties stipulated that Mr. Golden could not offer an explanation for the fees charged for time spent opposing Barb–Lin's motion for compensation. (Record II at 4–5). Thus, $300.00 for time billed on July 13 and 14,

1992 will be deducted from any recovery by Obermeyer. After reviewing the Applications, we do not find other instances where it appears that Debtor's counsel rendered services which did not at the time they were undertaken have the potential to benefit the estate.

■ An objection was also raised to the request for fees of Mr. Tabas for time spent on April 25, 1992, April 29, 1992, and May 11, 1992 for "preparing for confirmation hearing". As the objection notes, and Obermeyer acknowledges, no hearing for confirmation of the plan was scheduled. However, Obermeyer responds that Tabas's entry was merely mislabeled. Obermeyer asserts that Tabas' time was actually spent preparing for the motion for relief from the stay and that in preparing for the motion, Tabas focused on the confirmability of the plan. Obermeyer's Memorandum of Law at 10. Thus Obermeyer contends there was no miscalculation in billing hours. Obermeyer's explanation for the error appears reasonable and the fees will be allowed.

■ The Bank also argues that certain services performed by Obermeyer were intended to benefit insiders, not the estate. In particular, the Bank points to negotiations of potential settlements conducted by Debtor's counsel and Debtor's counsel permitting and then defending the Debtor paying insurance premiums on behalf of insiders. The Bank claims that the "conflict of interest" should result in the reduction or elimination of the requested fees and expenses. We disagree. While the Bank accuses certain of Debtor's insiders of numerous bad acts which appear to be substantiated by findings set forth by Judge Twardowski in his May 13, 1992 Order, Bank Memorandum of Law (First Application) at 11, none of the allegations against Obermeyer relating thereto have been supported in this record. Absent a proper evidentiary foundation, we cannot credit the Bank's bald assertions that Obermeyer "permitted" or "defended" said acts.[15] We have no reason to conclude on this record that the

---

15. Not surprisingly, Obermeyer claims that it did not know of any such acts by insiders at the time

Court's finding in its Order dated September 6, 1991 authorizing Obermeyer's retention that Obermeyer held no adverse interest to the Debtor or its estate was contradicted by Obermeyer's actions in this case.

### B. First Fee Application of Adelman Levine Gold and Levin, Counsel for the Committee.

Adelman requests compensation and reimbursement for services rendered on behalf of the Committee from November 5, 1991 through May 30, 1992, in the amounts of $68,809.50 and $5,034.71, respectively, for a total of $73,844.21.[16] The following objections were raised to Adelman's fee application:

1. Charges billed include services rendered prior to Court appointment;

2. Time entries lack requisite specificity;

3. Rates are excessive;

4. Paralegal's rates are both excessive and non-compensable;

5. Excessive time was charged for services, including "routine telephone calls";

6. Certain services did not benefit the Debtor;

7. Counsel for the Committee unnecessarily duplicated work performed by Debtor's counsel;

8. Certain expenses were not adequately documented and/or are otherwise non-compensable; and

9. Payment of the fees would prejudice the other creditors.

Although no objection was raised, we deduct from Adelman's application time in the amount of .70 hours, or $73.50, spent by Mr. Barson on May 26, 1992 preparing Lukens' fee application.

■ 1. Adelman is not entitled to compensation for services rendered prior to filing its application for appointment as counsel to the Committee. Adelman filed its application for appointment on November 7, 1991 but began performing services on behalf of the Committee on November 5, 1991. Thus, two days' services totaling $1,299.00 ($900 for 4.5 hours by Mr. Bressler) ($260 for 1.3 hours by Mr. Usdin) ($133.00 for 1.4 hours by Mr. Barson) will be disallowed. *See supra* p. 804.

■ 2. The objectors claim that Adelman's application lacks the requisite specificity. These objections are stated generally and do not question specific entries. The Court has reviewed Adelman's fee application in an attempt to verify this allegation. Our own investigating has failed to turn up any specific shortcomings relating to specificity. For example, entries for telephone calls state both the name of the person spoken to and the subject matter of the call. Entries for drafting correspondence state both to whom the correspondence was sent and the subject matter.

■ 3. The next objection is that the hourly rates charged by Adelman are excessive. Specifically, the fees requested for Mr. Barson's services were challenged. We credit the testimony of Mr. Bressler that the rates charged by Adelman herein were their standard rates. (Record I at 41). At the hearing on December 15, 1992, Adelman presented adequate testimony that Mr. Barson, then a second year associate, actively assisted the lead counsel and was being paid commensurate with professional standards. (Record I at 39). Further, we do not find that the rates charged for Mr. Barson's services ($95.00 at the beginning of the case which later increased to $105.00), or the services of the other attorneys from Adelman, diverged from the market norm.

■ We note that Mr. Bressler performed several services which at first blush

they occurred and that it did not thereafter defend such acts. Obermeyer Memorandum of Law at 9.

16. Forty percent of this claim has been paid pursuant to Court Order dated November 25, 1992.

appear inappropriate for an attorney to perform. However, these activities involved de minimis time on 5/2/92 (.20 hrs—organized documents), 5/4/92 (.30 hrs-collected cases on new value exception); 5/13/92 (.10 hrs-obtained names of corporate officers for corporate resolution), and 5/21/92 (.20 hrs-organized documents) and, if delegated to a lower cost person, would have been more costly than Mr. Bressler performing the tasks quickly as he did. As noted above, proper billing requires judgment and common sense.

■ 4. The objections also challenge the fees requested for work performed by a paralegal. Here, it appears that the paralegal was performing a variety of legal tasks which otherwise would have been performed by attorneys with higher billable rates. For example, Ms. Parsio handled numerous assignments regarding discrepancies in the Debtor's schedules. We credit Mr. Bressler's testimony that Adelman bills its private clients, as well as clients in bankruptcy court, separately for the paralegal's services. (Record I at 42). Adelman is entitled to compensation for these services.

■ 5. The objections urge that Adelman spent excessive time performing a variety of work including routine tasks such as telephone calls which were routinely billed at two tenths of an hour. We will address the routine tasks first. As stated earlier, Adelman's time entries are generally sufficiently specific and this is particularly true for entries relating to telephone calls. A review of the fee application revealed numerous telephone calls recorded at one-tenth of an hour and some recorded at greater than two tenths of an hour. We do not agree that excessive time was spent on telephone calls or that Adelman uniformly billed such calls at two tenths of an hour. The Bank also conceded that this objection was meritless. (Record I at 44).

■ The excessive time is also attributed to the attendance of multiple attorneys at hearings. Mr. Barson and Ms. Lipsky attended the December 19, 1991 hearing in connection with the Committee's objection to the Debtor's motion to extend exclusivity, billing 8 hours each. A review of the time entries revealed that Mr. Bressler originally assigned the matter to Mr. Barson who did extensive preparatory work under the guidance of Mr. Bressler. For some unexplained reason, Ms. Lipsky then became involved on this one issue and was working concurrently with Mr. Barson to prepare for this hearing which she then also attended. Given the nature of the issue and the principal responsibility assumed and discharged by Mr. Barson, we do not understand why Ms. Lipsky was involved. Her work appears duplicative of Mr. Barson and since Mr. Barson was being supervised by Mr. Bressler, her time may not be recovered. Accordingly, we will deduct 8 hours at $130 or $1,040.00 representing the time of Ms. Lipsky in this case.

■ On March 26, March 31, April 10 and April 27, 1992, Mr. Bressler participated in hearings on the Bank's Motion for Relief. Mr. Bressler testified that Mr. Barson accompanied him to these hearings to assist him and not for his own education. (Record I at 39). Mr. Bressler appropriately delegated discovery, including the time consuming task of deposing the Bank officer so Mr. Barson was involved in the stay litigation. Given the importance of the litigation to the Committee and his role in hearing preparation, we agree that Mr. Barson was in attendance for more than his own education. Adelman defended the Bank's request for relief along with Debtor's counsel because, in Mr. Bressler's opinion, the property was the main asset and the Committee was concerned about the actions of the Debtor's principals. (Record I at 34). Accordingly, we will reluctantly allow the time of both attorneys, cautioning counsel that where their position is being advocated by another party as here, the need for multiple lawyers is significantly diminished. However, as was the case with the Debtor's time entries for these hearings, there is a disparity in the time billed. While the time for the March 26 hearing appears high, we have no independent way to verify it since the three attor-

neys participating have charged approximately the same time. With respect to the April 10 hearing, Mr. Bressler's time of 13.0 hours which appears high for an adjourned hearing will be reduced by 1.5 hours or $300.00 to the still substantial time of 11.5 hours recorded by Mr. Barson. We will also reduce the April 27 hearing time to 8 hours each, recognizing that there were a total of 4 lawyers defending the motion on that date, and that is the time we allowed the Debtor. A reduction of 4.7 hours for Mr. Bressler and 3.7 hours for Mr. Barson, for a total of $1,328.50, will be made.[17]

6. The objections also state that the application should be reduced because not all of the services benefitted the estate. Specifically, the Bank not surprisingly claims that the Committee's opposition to the Bank's motion for relief was not beneficial to the estate. As stated earlier, the Bank's efforts to recover the property was a potentially deadly barrier to any recovery for the Committee's constituents. It is understandable that the Committee and therefore its counsel should conclude that active and vigorous participation was within the exercise of their fiduciary duty to the unsecured creditor body. We have already discussed how we feel Adelman could have discharged that duty in a more fiscally prudent manner. We again caution professionals seeking fees in this Court that they should be prepared to address the cost/benefit analysis they engaged in upon deciding to pursue a certain course of action, particularly where, as here, that course of action was so costly.

7. The objections also state that Adelman unnecessarily duplicated work performed by Debtor's counsel and should not be compensated. (Record I at 34–35). We have already discussed our view of the Committee's supportive role in the Bank litigation. With respect to work on the plan of reorganization, this objection fails because the interests of the Debtor and the Committee were different and required separate representation. While the Debtor and the Committee may have been working together, they were not working in total concert. There was coordination as well as negotiation. (Record I at 35). It was made clear at the hearing that neither the Committee nor the Debtor was willing to forego input in drafting the plan (Record I at 33–36) which is understandable in light of their disparate interests.

8. An objection is also raised to Adelman's failure to support certain expense charges including charges for meals, parking and calls from a car phone. Adelman generally provided adequate documentation to support the costs it incurred. Adelman, however, is not entitled to all of the costs it claims regardless of the adequacy of the documentation. For example, Mr. Barson charged $15.75 for parking on December 15, 1991. On that day he attended a hearing in Bankruptcy Court in Reading. Ms. Lipsky also attended that hearing and billed $3.75 for parking. It would appear that Ms. Lipsky billed for parking in Reading while Mr. Barson billed for parking in Philadelphia. If this is so, the estate should not bear the cost of Mr. Barson parking in Philadelphia since he had to come to work that day anyway. On February 7, 1992, Mr. Bressler apparently treated the Committee accountant, Mr. Caster to lunch at a cost of $7.00. On April 3, 1992 and May 1, 1992, Messrs. Bressler and Barson had lunch at a combined cost of $23.46. While these amounts are not large in the total context of this case, they are indicative of a mind set which we do not favor and

---

17. We note that the Committee, while an interested and affected party, was supporting the Debtor on this motion and the time entries reflected a commendable effort on the part of both counsel to coordinate their trial preparation. This coordination seemed to break down at the post-trial stage as both Mr. Barson and Mr. George were busily preparing Proposed Findings of Fact and Conclusions of Law. Given their common position, we would expect that coordination to follow through to the papers. Duplicative effort is not only costly to the estate but wasteful of the Court's time. Because we did not administer this case, we do not know, and the objecting Bank has not advised us, whether the post-trial submissions were a coordinated effort or two work products. We will give both parties the benefit of the doubt and allow the time.

which contributes to the view that attorneys are feeding at the trough of a debtor's estate. These are not costs for the estate to bear. Presumably, these gentlemen all would have eaten lunch anyway. Their need to eat lunch was not caused by the fact that they had to attend a hearing in Reading. Consequently, the meal expenses and parking fee requested by Adelman for Mr. Barson, for a total of $46.21, were not necessary expenses of representing the Committee and, therefore, are not compensable.

9. The objectors again argue that if Adelman is successful in establishing its claim, other creditors will be unable to receive an equitable portion of the estate. This objection was discussed above and is rejected here for the reasons there stated.

### C. Application of Concannon, Gallagher, Miller & Company, P.C., Accountant for the Committee.

Concannon requests compensation for fees and expenses incurred between November 5, 1991 and May 15, 1992. The application states that the fee for Concannon's services is $12,268.00, which when combined with expenses totaling $140.00 results in an aggregate claim for $12,408.[18] The United States Trustee (the "Trustee") and the Bank raise the following objections:

1. The application lacks the requisite specificity and "lumps" activities;

2. Applicant charges for non-compensable administrative overhead;

3. Applicant seeks compensation for services rendered prior to appointment;

4. Billing increments exceed one tenth of one hour; and

5. Multiple professionals attended hearings.

Even though no objection was raised, we exercise our independent duty and reduce the fees requested by Concannon by 3.5 hours, or $385.00, for time spent preparing the fee application.

18. Pursuant to an Order dated November 2,

1. Many of the time entries in Concannon's fee application are lumped. Numerous telephone calls are lumped under a single time entry. Of particular note are the time entries of Robert M. Caster on November 5 and 6, 1991, January 6 and 24, 1992, February 13, 1992, and June 4, 1992. This Court is unable to discern how much time Mr. Caster spent performing what task. Consequently, $2,392.50 will be deducted from Concannon's requested fees relating to these six time entries by Mr. Caster.

2. With the exception of the preparation of the fee application, addressed above, the objection that Concannon's application charges for administrative overhead is not substantiated upon review of the application itself and is denied.

3. Concannon charged for services rendered prior to applying to the court for appointment on November 13, 1991. Fees for services rendered prior to filing its application for appointment are not compensable and $978.75 will be deducted from Concannon's request.

4. Concannon testified that its practice of billing in one quarter of one hour increments is normally allowed by the court. Even if allowed by other courts, which we question, we require time to be billed in increments of one tenth of one hour. We have no reason to discredit Mr. Caster's testimony that time spent in increments of less than 15 minutes was not billed. (Record I at 24). However, there may have been instances where Concannon's professionals billed 30 minutes for work which actually took 20 minutes. As stated above, we believe that billing in increments of .1 lends to a more accurate record of the services performed. Since there was no rule of Court or guideline requiring billing in .1 increments when Concannon performed its services, we will not impose any penalty or extra billing requirement on Concannon since it would have had no way to know this Court's policy. In the future, we expect all professionals to bill in increments of one tenth of an hour.

1992, 40% of this claim was paid.

■ 5. Concannon adequately supported its charge for the attendance of Mr. Caster at the hearing on March 31, 1992. Mr. Caster spent 5 hours preparing for the hearing and .75 hours for actually attending the hearing. We credit the testimony of Mr. Caster that he attended the hearing on that day at the request of the Committee's attorney to hear the testimony of other experts with respect to the Bank's motion for relief, presumably to provide rebuttal testimony if necessary. (Record I at 18–19). We commend Mr. Caster who, according to his time entry for March 31, 1992, left the hearing when it became apparent that his testimony would not be needed. Thus, no deduction is warranted.

### D. Application of Reaves Lukens Company, Appraiser for the Committee.

Lukens, the Committee's appraiser, filed an application seeking compensation for services rendered between February 10, 1992 and April 10, 1992. The compensation requested totals $22,180.[19] The Bank objected to the fees on the following grounds:

1. Rates were excessive;

2. Entries lack the required specificity and contain lumped activities; and

3. Multiple appraisers attended hearings.

■ 1. Lukens' regularly charged rates are afforded a presumption of reasonableness. We credit the testimony of Mr. Lukens that the rates charged were consistent with the norm in the industry. (Record I at 9). Moreover, Lukens' retention order specifically allowed up to $10,000 to perform the appraisal which was completed at a cost of $9,980.

■ 2. The Bank's objection to Lukens' notation of time spent in "discussions" and in "meetings" ($1,615.00) and making "telephone calls" ($250.00) is valid in that such entries include lumped time and lack the requisite specificity. Consequently, $1,865 will be deducted from Lukens' requested fees.

■ 3. There is an objection raised to the charges for two appraisers attending two hearings on the Bank's motion for relief. With respect to the March 26, 1992 hearing, we credit Mr. Lukens' testimony that Mr. Main's attendance at both hearings was necessary to verify data presented by other parties and because, as born out by the fee application, Mr. Main, a registered architect and real estate appraiser, performed much of the preparatory work for the trials. (Record I at 15). Again, given the significance and hotly contested nature of this litigation, we will allow these charges. For the same reasons, we will allow the time billed by Lukens ($2,375.00) and Main ($380.00) for attending the adjourned April 10, 1992 hearing.

### E. Application of S.L.G., a Co–Partnership, Manager.

■ S.L.G. seeks Court approval of its application for compensation in the amount of $36,250.00 for management services rendered to the Debtor for the time period from December 19, 1991 to May 14, 1992. The Bank and the Committee objected to the application on numerous grounds: (1) court approval not obtained; (2) no detailed record of work performed; (3) in violation of court order not to pay management fees to itself after December 19, 1991; (4) offsets for amounts owed to estate exceed claim; and (5) claim is untimely. We only need discuss the last ground since it will resolve the objections here.

■ By Order dated August 27, 1992, the Court set October 16, 1992 as the bar date for the filing of administrative proofs of claim. S.L.G. filed its request for fees on October 20, 1992 after the deadline. S.L.G. did not file a motion to extend the bar date. Bar dates established by the Court must be "strictly construed" to promote the efficient administration of bankruptcy proceedings. *In re Pigott,* 684 F.2d 239, 242 (3d Cir.1982). *See also In re Vertientes, Ltd.,* 845 F.2d 57, 60 (3d Cir.1988); *In re Metro Transportation Company,* 117 B.R. 143, 148 (Bankr. E.D.Pa.1990). Nor has S.L.G. sought to prove excusable neglect under Fed. R.Bankr.P. 9006 entitling it to file its applica-

---

19. By Order dated November 2, 1992, the Debtor paid 40% of the requested fees.

tion in an untimely manner. Absent a showing of excusable neglect, S.L.G. is barred from recovery on an untimely administrative claim for post-petition services. *New York City Shoes, Inc. v. McCarthy*, 115 B.R. 64 (E.D.Pa.1990).

S.L.G.'s request for fees and expenses is denied.

## CONCLUSION.

Based on the foregoing, fees and expenses are allowed to the professionals who rendered service in the Chapter 11 case as follows:

| Firm | Requested | Allowed | Paid to Date [20] | Due |
|---|---|---|---|---|
| Obermeyer, Rebmann, Maxwell & Hippel (First Application) | $85,927.50 (Fees) | $80,137.50 | $54,227.26 | $25,910.24 |
| | $12,140.63 (Expenses) | $12,140.63 | 0 | $12,140.63 |
| Obermeyer, Rebmann, Maxwell & Hippel (Second Application) | $17,514.50 (Fees) | $16,124.00 | 0 | $16,124.00 |
| | $ 5,146.63 (Expenses) | $ 5,146.63 | 0 | $ 5,146.63 |
| Adelman Lavine Gold and Levin | $68,809.50 (Fees) | $64,768.50 | $29,537.69 | $35,230.81 |
| | $ 5,034.71 (Expenses) | $ 4,988.50 | 0 | $ 4,988.50 |
| Concannon, Gallagher, Miller & Company | $12,268.00 (Fees) | $ 8,511.75 | $ 4,963.20 | $ 3,548.55 |
| | $ 140.00 (Expenses) | $ 140.00 | 0 | $ 140.00 |
| Reaves Lukens & Company | $22,180.00 (Fees) | $20,315.00 | $8,872.00 | $11,443.00 |

Orders consistent with the foregoing Opinion will be entered.

20. For the purposes herein, we will assume that the 40% payments received by Obermeyer, Adelman, Lukens and Concannon were allocated to fees.